Robert A. **FALISE**, Louis **Klein**, Jr., **Frank Macchiarola, Christian E. Markey, Jr., as Trustees, Plaintiffs,**

v.

**THE AMERICAN TOBACCO COMPANY; R.J. Reynolds Tobacco Company; B.A.T. Industries, PLC; Brown & Williamson Tobacco Corporation; Philip Morris Incorporated; Liggett Group, Inc.; Lorillard Tobacco Company, Defendants.**

No. CV 97–7640.

United States District Court, E.D. New York.

Nov. 2, 1999.

50

Kazan, McClain, Edises, Simon & Abrams, Oakland, CA, By James L. Stengel, Steven L. Kazan, for Plaintiffs.

Greenberg Traurig, New York, By Alan Mansfield, Stephen L. Saxl, for Defendants Lorillard Tobacco Company, Philip Morris Incorporated, and R.J. Reynolds Tobacco Company.

Shook, Hardy & Bacon, Kansas City, MO, By Gary Long, Gay Tedder, Terrence Sexton, Andrew Carpenter, for Defendants Lorillard Tobacco Company and Philip Morris Incorporated.

Winston & Strawn, Chicago, IL, By Dan Webb, Jeffrey M. Wagner, for Defendant Philip Morris Incorporated.

Riker Danzig Scherer Hyland & Perretti, Morristown, NJ, By Alan Kraus, Keith Weingold, Womble Carlyle Sandridge & Rice, PLC, Winston–Salem, NC, By Thomas D. Schroeder, Womble Carlyle Sandridge & Rice, PLC, Atlanta, GA, By R. Dal Burton, for Defendant R.J. Reynolds Tobacco Company.

Kirkland & Ellis, Chicago, IL, By David M. Bernick, James Munson, Deirdre A. Fox, for Defendants the American Tobacco Company and Brown & Williamson Tobac-

co Corporation, individually and as successor by merger to the American Tobacco Company.

*MEMORANDUM, ORDER AND JUDGMENT*

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................... 51

II. BRIEF HISTORY OF MANVILLE ASBESTOS LITIGATION .................. 52
    A. Before Bankruptcy in 1982 ............................................. 53
    B. Bankruptcy Proceedings, 1982–88 ....................................... 54
    C. First Period of Trust Operation, 1988–1996 ............................. 54
    D. Second Period of Trust Operation, 1996 to Present ...................... 55
        1. New Plan ......................................................... 55
        2. Legal Controversies .............................................. 55

III. PRESENT LITIGATION ............................................. 55

IV. JURISDICTIONAL LAW ............................................. 56
    A. "Related to" Bankruptcy Jurisdiction .................................. 56
        1. Analysis of the Four Factors ..................................... 57
            a. Debtor ....................................................... 57
            b. Administration of the Bankruptcy Case ........................ 57
            c. Bankruptcy Estate ............................................ 58
            d. Distribution to Creditors ..................................... 58
            e. Conclusion ................................................... 58
        2. The Plan's Terms ................................................ 58
        3. Future Claimants ................................................ 60
        4. The *Bergstrom* Decision ......................................... 60
        5. Supervision of the Trust ......................................... 61
    B. Other Jurisdictional Contentions ...................................... 62

V. Application of Law to Facts ......................................... 62

VI. Conclusion ...................................................... 63

### I. Introduction

Plaintiffs represent a Trust established in 1988 as a result of the bankruptcy of Johns–Manville Corporation (Manville), a producer of asbestos products. Defendants are the major tobacco product manufacturers and related entities (Tobacco). The Trust seeks recovery for Tobacco's role in contributing to asbestos related injuries. Among other theories, the Trust argues that had it been aware of the malign synergistic medical effect of smoking on those claiming compensation because of exposure to Manville's asbestos, either it or Manville would have sued Tobacco years ago for contribution.

All of plaintiffs claims are based upon state law. They nonetheless allege federal subject matter jurisdiction (competence of the district court) predicated upon the federal courts' role in establishing the Trust in the bankruptcy proceeding and its continuing power over Trust. The action was assigned to the judge of the Eastern District of New York sitting by designation in the district court for the Southern District of New York.

Defendants move to dismiss on the ground that the federal courts lack competence to adjudicate the case. The motion must be granted. It is, therefore, unnecessary to address defendants' summary judgment motion arguing that the evidence cannot support a recovery predicated on the Trust's substantive theory.

Dismissal is mandated because bankruptcy courts possess only limited competence. This deficiency is particularly ap-

parent where, as in the instant case, the plan of reorganization has already been confirmed, and the bankruptcy proceeding terminated. Continuing jurisdiction of federal courts over litigation affecting a long-established trust such as this one is limited to relatively minor matters such as interpreting prior orders and regulating the processing of claims. It does not extend to a major suit brought by the Trust against those not a party to the bankruptcy or to any closely related proceeding.

## II. Brief History of Manville Asbestos Litigation

The sordid legal disasters constituting the asbestos, the tobacco and the overlapping litigations have often been told. *See, e.g., In re Johns–Manville Corp.*, 36 B.R. 743 (Bankr.S.D.N.Y.1984) (representatives of future claimants may appear); *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636 (2d Cir.1988) (background of asbestos-caused diseases, bankruptcy litigation and approval of Plan of reorganization); *In re Joint E. and S. Dist. Asbestos Litig. (In re Johns–Manville Corp.)*, Bankruptcy Nos. 82 B 11656(BRL) to 82 B 11676(BRL), 1990 WL 115772 (E.D.N.Y. July 16, 1990) (stay of all payments to claimants); *In re Joint E. and S. Dist. Asbestos Litig. (In re Johns–Manville Corp.)*, Bankruptcy Nos. 82 B 11656(BRL) to 82 B 11676(BRL), 1990 WL 115772 (E.D.N.Y. July 16, 1990) (explaining need for stay); *Findley v. Blinken (In re Joint E. and S. Dist. Asbestos Litig.; In re Johns–Manville Corp.)*, 129 B.R. 710 (E.D.N.Y.1991) (history of asbestos, diseases, knowledge, bankruptcy, Trust operations; class action to modify Trust operations; approval of settlement), *rev'd*, 982 F.2d 721 (2d Cir.1992), *modified*, 993 F.2d 7 (2d Cir.1993); *Findley v. Blinken (In re Joint E. and S. Dist. Asbestos Litig.; In re Johns–Manville Corp)*, Nos. 82 B 11656(BRL) to 82 B 11264(BRL), 1992 WL 364271 (E.D.N.Y. Dec. 7, 1992) (stay of payments); *Findley v. Blinken (In re Joint E. and S. Dist. Asbestos Litig.; In re Johns–Mansville Corp.)*, 830 F.Supp. 686 (E.D.N.Y.1993) (appointment of panel under Rule 706 of Federal Rules of Evidence to estimate future claims); *Findley v. Blinken (In re Joint E. and S. Dist. Asbestos Litig.; In re Johns–Manville Corp.)*, 151 F.R.D. 540 (E.D.N.Y.1993) (quashing subpoena directed to Rule 706 experts); *1,087 Va. Asbestos Disease Judgment and Settlement Creditors of the Manville Corp. Asbestos Disease Compensation Fund v. Manville Personal Injury Settlement Trust (In re Joint E. and S. Dist. Asbestos Litig.; In re Johns–Manville Corp.)*, 14 F.3d 151 (2d Cir.1994) (approving order permitting payments in reduced amounts); *Findley v. Laughead (In re Johns–Manville Corp.)*, 27 F.3d 48 (2d Cir.1994) (authority to stay payments under All Writs Act); *Findley v. Falise (In re Joint E. and S. Dist. Asbestos Litig.; In re Johns–Manville Corp.)*, 878 F.Supp. 473 (E.D.N.Y.1995) (approving modification of plan for payments to those with medical claims; jurisdiction over Trust), *aff'd and remanded for further findings*, 78 F.3d 764 (2nd Cir.1996); *Findley v. Falise (In re Joint E. and S. Dist. Asbestos Litig.; In re Johns–Manville Corp.)*, 929 F.Supp. 1 (E.D.N.Y.1996) (interpreting new Plan); Paul Brodeur, *Outrageous Misconduct: The Asbestos Industry on Trial* (1985); Barry I. Castleman, *Asbestos: Medical and Legal Aspects* (4th ed.1996); National Academy of Engineering, *Product Liability and Innovation* 135–36 (1994); George A. Peters & Barbara J. Peters, *Sourcebook on Asbestos Diseases* (1980–1999) (nineteen volumes); S. Elizabeth Gibson, *Mass Torts Limited Fund and Bankruptcy Reorganization Settlements: Four Case Studies* 1–45 (Federal Judicial Ctr.1999); Jay Tidmarsh, *Mass Tort Settlement Class Actions: Five Case Studies* 47–74 (Federal Judicial Ctr. 1998); Advisory Committee on Civil Rules and the Working Group on Mass Torts, *Report on Mass Tort Litigation* app. E (1999) (report without appendices is reported at 187 F.R.D. 293 (1999); Thomas E. Willging, *Mass Torts Problems and*

*Proposals: A Report to the Mass Torts Working Group*, 187 F.R.D. 328 (1999); Conference on Mass Torts, Mass Torts Working Group, Phila., Pa., May 27–28, 1998, § 14 (1998) (discussing National Bankruptcy Review Commission's Proposal)); Frank J. Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future*, 17 Cardozo L.Rev. 583 (1996); Stephen Labaton, *How a Company Lets Its Cash Talk*, N.Y. Times, Oct. 17, 1999, § 3, at 1 (on obtaining legislative protection from asbestos suits); *see generally* Andrews Asbestos Litig. Rep. (semimonthly Feb. 1979 to date); Mealey's Asbestos Litig. Rep. (semimonthly Feb. 1984 to date); 1 Sourcebook on Asbestos Diseases: Case Law Quarterly (1989–1990).

For the purpose of this motion, a summary will suffice to establish that Tobacco has not been legally involved in the Trust's genesis or life. Four periods are relevant: (1) the years leading up to Manville's 1982 bankruptcy filing; (2) the pendency of the bankruptcy proceeding until the Trust began operations under an approved Plan in 1988; (3) the operation of the Trust from 1988 to 1996 (it was stayed from making payments to claimants from 1990 to 1996); and (4) the operation of the Trust from 1996 to the present when it employed a new mode of dealing with claimants.

## A.  Before Bankruptcy in 1982

Manville was the world's largest producer of asbestos products. At least as early as the 1930s, it was aware of the dreadful dangers to the lungs and other bodily parts of its own workers and other workers exposed to asbestos. It had also concluded by that time that smoking by workers in its plants presented independent dangers of lung diseases because smoking plus asbestos exposure had a multiplying effect in inducing lung diseases. Manville was aware of sufficient general epidemiological research which, together with its workers' compensation records and other internal materials, supported its conclusions about the dangers of simultaneous exposure to asbestos and tobacco.

In the mid–1970s, Manville outlawed smoking in its asbestos plants as a prophylactic program. Yet, in one of the many curious events in the annals of these litigations, unions (whose officials should have been aware of the dangers) sued to prevent Manville's anti-smoking orders from being enforced. *See, e.g.,* Memorandum from Fred Panzer to Horace R. Kornegay, June 8, 1979, at 2 ("The position of unions in the asbestos-smoking controversy is anti-anti-smoking. They are more opposed to Johns–Manville than to tobacco"), *reprinted in* Affidavit of James L. Stengle in Opposition to Defendant's Motion to Dismiss, exhibit 32. In fact, Tobacco employed a major law firm to write the briefs for the union. *See* Memorandum of Covington & Burling, June 25, 1977, *reprinted in* Stengle affidavit, *supra,* exhibit 36; *Johns–Manville Sales Corp. v. International Assoc. of Machinists, Local Lodge 1609,* Memorandum in Support of Defendant's Motion for Summary Judgment (Apr. 26, 1977) (S.D.Tex.), *reprinted in* Stengle affidavit, *supra,* exhibit 37 (memorandum prepared for unions opposing smoking ban by attorneys for Tobacco). The union-and-Tobacco-led litigation resulted in the smoking ban being lifted by the federal courts, thus probably substantially increasing the hazards to asbestos workers.

In the Brooklyn Navy Yard asbestos litigation during the 1980s and 1990s, testimony revealed that the Yard's medical staff along with the highest levels of government officials were aware of the dangers to workers exposed to asbestos while building our capital ships and aircraft carriers during World War II. *See In re E. and S. Dist. Asbestos Litig.,* 772 F.Supp. 1380, 1388 (E.D.N.Y.1991), *aff'd in part, rev'd in part on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831 (2d Cir.1992). Yet, neither government, unions nor Manville took any effective action to protect or to warn the

thousands of young workers of the dangers of asbestos, particularly in conjunction with smoking.

The workers remained unaware of the dangers· or were already so addicted that (without the medical rehabilitative modes presently available) they smoked while they breathed asbestos dust. For many this was a form of slow suicide. Ultimately many of these workers and their survivors made claims against Manville and the Trust because of serious asbestos-related diseases.

Even though production of asbestos products by Manville and other producers had largely ceased by the 1970s, the latency periods associated with these diseases predictably will result in some 600,000 claims being brought against the Trust. Credible new claims are expected to be filed until the middle of the twenty-first century.

By 1980 many thousands of asbestos workers' suits were pending against Manville in state and federal courts. Manville did not implead Tobacco in these suits. Faced with a threatened avalanche of additional cases, Manville filed a petition in bankruptcy staying further litigation.

## B. Bankruptcy Proceedings, 1982–1988

The negotiations and appeals during the bankruptcy proceedings took some six years. Manville gave up most of its equity and assets to the Trust which was established to administer the Plan. Manville's Insurance supplied a substantial infusion of cash as well. Provided in the approved Plan was (1) full payment to commercial creditors, (2) a system of payment to current claimants on a first-in, first-out basis, with priority, as a practical matter, being given to pre-bankruptcy petition cases, and (3) provision for payments to future claimants. "Values" of claims were to be determined on a negotiated-settlement-administrative basis, with the possibility of an "escape" to the tort-court system.

The suggestion that Tobacco be brought into the bankruptcy proceedings for its role in causing claimants' diseases was considered by those responsible for those proceedings, including claimants. This option was not adopted by the parties negotiating the bankruptcy Plan. Tobacco was never involved in the bankruptcy proceedings.

## C. First Period of Trust Operation, 1988–1996

Even before the Trust began to make payments in 1988 to claimants under the Plan, it was apparent to the attorneys for the claimants and to the Trust that the assets of the Trust were grossly insufficient to pay present and future claimants. Nonetheless, the Trust paid huge sums from its limited capital to plaintiffs' attorneys, who effectively controlled the Trust, for their clients and for their own fees. The Trust's funds were also being bled by huge transactional costs—at the rate of some $1,000,000 a week—defending suits by those seeking to escape the queue before the Trust's money ran out. As a result, the Trust's assets were soon exhausted.

Settlements were negotiated in bulk, with little relationship to litigated value or to the projected tort-court recoveries upon which the Plan had been predicated. Discounts were, however, made for smoker-claimants during these negotiations on the assumption of contributory negligence. The Trust did not implead Tobacco in the litigations pending against it.

Claims multiplied in numbers and values far beyond what had been contemplated in the bankruptcy proceedings. For all intents and purposes, the Trust was insolvent. Yet, neither the Trust nor anyone else sued Tobacco or sought to implead it.

The district and bankruptcy courts learned in 1990 that it was impossible for the Trust to pay judgments in the many cases already in litigation or in settlements of other claims. The courts promptly stayed payments by the Trust. *See In re*

*Joint E. and S. Dist. Asbestos Litig.*, 1990 WL 115772 (stay of all payments to claimants); *In re Joint E. and S. Dist. Asbestos Litig.*, 1990 WL 115785 (explaining need for stay). The trustees and chief operating officer of the Trust were replaced.

Negotiations were undertaken through a class action suit against the Trust to revise the payment Plan. *See Findley*, 129 B.R. 710; *Findley*, 982 F.2d 721. Tobacco was not impleaded.

In 1994, Congress passed a special law to ensure that the assets of the former asbestos corporations were not subject to claims after bankruptcy. *See* Bankruptcy Reform Act of 1994, Pub.L. 103–394, § 111(a), 108 Stat. 4106, 4113–4117 (codified at 11 U.S.C. § 524(g), (h)). All future claims arising from delicts of Manville had to be made against the Trust. *See In re Joint E. & S. Dist. Asbestos Litig.*, 878 F.Supp. at 570–71 (description of Amendment to bankruptcy statute and its effect).

### D. Second Period of Trust Operation, 1996 to Present

#### 1. New Plan

After extensive hearings and appeals—taking into account the needs of third party producer-claimants, future claimants and others, as well as fiscal realities—payments recommenced under a new Plan in 1996. These payments were based on a matrix, with almost no realistic opportunity to escape to the tort-court system. *See Findley*, 878 F.Supp. 473 (approval of settlement of class action modifying Plan); *id.* at 575–80 (stipulation of settlement); *id.* at 580–615 (new Trust Distribution Process).

In view of the limited remaining assets of the Trust and the projected number of claims, payments were limited to 10% of the value of claims fixed by the new Plan. Legal fees were also limited in order to protect the Trust's assets.

Claims' values were discounted by taking into account the smoking history of claimants:

The Scheduled Values are based on extensive review of the current settlement and litigation environment and on the Trust's historic experience settling claims using the C[laims] R[esolution] P[rocedure] Factors....

*Id.* at 585; *see also id.* at 583 (consideration of "alternative causes" in determining liability); Macchiarola, 17 Cardozo L.Rev. at 608 (distinguishing between smokers and non-smokers under one proposal for modification of original Plan).

#### 2. Legal Controversies

During this second phase of the Trust's operations, a class action was brought in the district court requiring interpretation of the new Plan. A number of aggrieved claimants challenged the Trust's medical assessment of diseases. The case was settled during trial.

This suit was based upon diversity and bankruptcy jurisdiction. The court, acting as a bankruptcy and district court, determined that it had competence pursuant to diversity jurisdiction and its power to interpret the amended Plan. *See In re Joint E. and S. Dist. Asbestos Litig.*, 878 F.Supp. at 600 (Trust given right to "seek an Order from the Courts" to make amendment if Selected Counsel for the Beneficiaries is acting unreasonably).

Another dispute was resolved informally in 1999 by a court appointed special master. He helped mediate a settlement providing for techniques resolving medical claims by a large class of seafarers.

Both of these post-new Plan litigations involved the interpretation of the Plan's terms. The situation in the instant case is not so limited.

### III. Present Litigation

The present litigation is before the district court sitting in bankruptcy. As already noted, it is based on the theory that Tobacco has hidden the dire effects of smoking and, particularly, of the synergetic effects of simultaneous exposure to to-

bacco smoke and asbestos air-borne fibers. The Trust contends that, had it been aware of what has now become common knowledge as a result of recent anti-Tobacco tort litigation across the country and revelation of heretofore unknown Tobacco documents, it would have succeeded in making defendants legally responsible for a large part of the claims it has paid since 1988 and will pay in the future.

## IV. Jurisdiction Law

Neither diversity nor federal question jurisdiction (independent of bankruptcy jurisdiction) is alleged. Instead, plaintiffs' primary argument is that jurisdiction exists pursuant to section § 1334(b) of title 28. That section provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the bankruptcy title], or arising in or related to cases under" the bankruptcy law.

It is plaintiffs' view that jurisdiction exists under the "related to" provision of section 1334(b). Plaintiffs make several arguments as to why this case falls within this provision including that the district court retained jurisdiction through the language of the Plan of reorganization. Plaintiffs' contentions are unfounded.

■ Analysis begins with a bedrock principle of federal jurisdiction: Federal courts possess only limited competence, usually referred to as subject matter jurisdiction. *See* U.S. Const. art. III, § 2, cl. 1; *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute."). An inquiry on competence starts with the assumption of a lack of subject matter jurisdiction. *See Kokkonen,* 511 U.S. at 377, 114 S.Ct. 1673; *Turner v. Bank of N. Am.,* 4 U.S. (4 Dall.) 8, 11, 1 L.Ed. 718 (1799). The "burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen,* 511 U.S. at 377, 114 S.Ct. 1673; *see also*

*McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182–183, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

■ A district judge sitting as a bankruptcy court has severely cabined jurisdiction. Bankruptcy judges are not Article III judges. They lack the protection of life tenure subject to their continued "good Behavior." U.S. Const. art. III, § 1, cl. 2. Accordingly, there are significant restriction on what functions can be constitutionally delegated to these bodies. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion); *id.* at 89–90, 102 S.Ct. 2858 (Rehnquist, J., concurring in judgment); 1 Collier on Bankruptcy ¶ 3.01[4][c][v], at 3–30 (15th ed. 1999) (If a district court is without jurisdiction, "[p]erforce . . . [the case] cannot reside in the bankruptcy court.").

## A. "Related to" Bankruptcy Jurisdiction

The jurisdiction of bankruptcy courts, like all federal trial courts, is statutorily created. As already noted, section 1334(b) grants district courts jurisdiction over proceedings "arising under" the bankruptcy title, "or arising in or related to cases under" the bankruptcy title. 28 U.S.C. § 1334(b). District judges may refer proceedings that fall within this section to bankruptcy judges. *See* 28 U.S.C. § 157(a). In the series of post-bankruptcy proceedings prior to the instant one, the district court removed the bankruptcy case to itself, acting as a bankruptcy judge.

The present case does not "aris[e] under" any provision in the bankruptcy title. Thus, in order for federal jurisdiction to exist, the instant proceeding must either fall within the "arising in" or "related to" language of section 1334(b). *See Celotex Corp. v. Edwards,* 514 U.S. 300, 307, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). Plaintiffs rely solely on the "related to" provision. This is unsurprising because this proceeding is not one of the " 'administrative' matters that arise *only* in bankruptcy

cases." *In re Wood,* 825 F.2d 90, 97 (5th Cir.1987) (emphasis in original); *see also Eastport Assocs. v. City of Los Angeles (In re Eastport Assocs.),* 935 F.2d 1071, 1076 (9th Cir.1991); Collier, *supra,* ¶ 3.01[4][c][iv], at 3–29.

As the Supreme Court noted in *Celotex,* Congress declined to delineate the scope of "related to" jurisdiction, but "its choice of words suggests a grant of some breadth." *Celotex,* 514 U.S. at 307–08, 115 S.Ct. 1493. Courts of appeals appear somewhat divided as to the meaning of "related to." The test used in the majority of circuits is "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Id.* at 308 n. 6, 115 S.Ct. 1493 (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)) (internal quotation marks and emphasis omitted).

The Second Circuit "seem[s] to have adopted a slightly different test." *Id.,* 308–09, 115 S.Ct. 1493 (citing *Turner v. Ermiger (In re Turner),* 724 F.2d 338, 341 (2d Cir.1983)). In *Turner,* Judge Friendly described the test as whether an action possessed a "significant connection" with a bankruptcy proceeding. *Turner,* 724 F.2d at 341. The *Celotex* Court implied that the *Pacor* and *Turner* tests are only minimally different, and the court of appeals for the Second Circuit has employed both of them. *See Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2d Cir.1992). In any event, the distinction is irrelevant to the instant proceeding.

■ The most important aspect of any of these tests is that "bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor." *Celotex,* 514 U.S. at 308–09 n. 6, 115 S.Ct. 1493. To rephrase this requirement slightly more broadly, a civil proceeding which has [1] no effect on the debtor or "which would not impact upon [2] the administration of the bankruptcy case, or [3] on property of the estate, or [4] on the distribution to creditors, cannot find a home in the district court based upon its bankruptcy jurisdiction." Collier, *supra,* ¶ 3.01[4][c][v], at 3–30 (15th ed.1999). This case satisfies none of these criteria.

### 1. Analysis of the Four Factors

#### a. Debtor

The debtor, Manville, is not a party to this litigation—and has been freed of any connection to all asbestos litigation by both the termination of the bankruptcy proceedings and a special Congressional statute providing a safe harbor, *see* 11 U.S.C. § 524(g),(h). Instead, an entity that was a product of the bankruptcy proceeding, the Trust, has sued a third party for money allegedly owed to it.

#### b. Administration of the Bankruptcy Case

■ The bankruptcy case was terminated in 1988. *See Kane,* 843 F.2d 636. While it is true that jurisdiction can continue to ensure that the plan is complied with, this is a limited grant:

> [A] court may retain jurisdiction, after confirmation, to guarantee that the plan of reorganization is complied with, but it may not keep the [debtor] corporation in "perpetual tutelage" by exercising control over all aspects of the corporate conduct or by assuming jurisdiction over controversies between the reorganized corporation and third parties.

*Claybrook Drilling Co. v. Divanco, Inc. (In re Divanco, Inc.),* 336 F.2d 697, 701 (10th Cir.1964).

■ A court's jurisdiction is limited under such circumstances "to 'protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation.'" *Pennsylvania Cos. Inc. v. Stone (In re Greenley Energy Holdings, Inc.),* 110 B.R. 173, 180 (Bankr.E.D.Pa.1990) (quoting *In re Dilbert's Quality Supermarkets, Inc.,* 368 F.2d 922, 924 (2d Cir.1966)). The instant litigation, however, is not brought to fur-

ther these purposes. While plaintiffs contend that the Plan is interfered with because of the limited funds that the Trust possesses, this is an insufficient basis for jurisdiction. *See infra* Subparts IV.A.2–4.

### c. Bankruptcy Estate

■ Litigation to which the debtor is not a party can also fall within the "related to" jurisdictional grant as long as it has an impact on the bankruptcy estate. *See, e.g., National Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy, Inc.),* 837 F.2d 325, 330 (8th Cir.1988); *In re Pan Am. Sch. of Travel, Inc.,* 47 B.R. 242 (Bankr.S.D.N.Y.1985); Collier, *supra,* ¶ 3.01[4][c][ii], at 3–23 to 3–24, 3–31; *see also North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp.,* 143 F.2d 938, 940 (2d Cir.1944) (pre-Code decision discussing limited post-confirmation involvement of bankruptcy court).

■ A bankruptcy estate is created when a bankruptcy case is commenced, *see id.* § 541(a), and includes a wide range of property interests, *see id.* The confirmation of the plan in a Chapter 11 reorganization generally terminates the debtor's estate. *See* 11 U.S.C. § 1141(b) (except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate of the debtor); *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 587 (9th Cir.1993); *United States v. Unger,* 949 F.2d 231, 233 (8th Cir.1991); *Portfolio Lease Funding Corp. v. Seagate Tech., Inc. (In re Atlantic Computer Sys., Inc.),* 163 B.R. 704 (Bankr.S.D.N.Y.1994) ("confirmation and substantial consummation of the Debtor's Joint Plan means that this Debtor's estate no longer exists").

As Judge Lifland has held, "confirmation and substantial consummation of the Debtor's Joint Plan means that this Debtor's estate no longer exists. Thus, this adversary proceeding, while it might affect the post-confirmation, liquidated [debtor] or its parent corporation (holder of the residue interest in the remaining undis-

tributed cash held by the Trusts), cannot affect the Debtor's non-existent estate." *In re Atlantic Computer Sys., Inc.,* 163 B.R. 704, 706 (Bankr.S.D.N.Y.1994) (internal citations omitted). Because there is presently no bankruptcy estate, there can be no continuing jurisdiction over that non-existent estate.

### d. Distribution to Creditors

The claimants to the Trust's assets were and are—in a sense—creditors of Manville. This litigation might impact the distribution of the Trust by increasing assets available to the claimants. This impact, however, is only relevant to the issue of bankruptcy jurisdiction when it affects the pre-confirmation estate. For reasons discussed in more detail below, *see infra* Subparts IV.A.2–4, the mere possibility of increasing the size of the Trust's assets postconfirmation is insufficient to create jurisdiction.

The claimants are not creditors of the estate. They are claimants entitled to rights under a fixed matrix and procedures against the Trust. They can not, therefore, claim that jurisdiction is proper under such a theory.

### e. Conclusion

As the analysis of these four factors makes clear, bankruptcy jurisdiction is extremely limited after a plan has been confirmed. Once confirmation has taken place, the estate is usually terminated, and any impact affects the parties who were involved in the bankruptcy proceedings but not the proceedings themselves.

### 2. The Plan's Terms

■ Although jurisdiction is much more restricted after confirmation has occurred, a bankruptcy court can retain jurisdiction post-confirmation as long as the plan or its confirmation provides such continuing jurisdiction. As the Second Circuit held in another litigation involving Manville, a "bankruptcy court retains post-con-

firmation jurisdiction in a chapter 11 proceeding *only* to the extent provided in the plan of reorganization." *Hospital and Univ. Property Damage Claimants v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 7 F.3d 32, 34 (2d Cir.1993) (emphasis added); *see also Hillis Motors*, 997 F.2d at 587; *Back v. LTV Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 638 (S.D.N.Y.1997).

Post-confirmation bankruptcy jurisdiction is defined by reference to the plan of reorganization. *See Hospital and Univ. Property Claimants*, 7 F.3d at 34. For example, in *Hospital and University Property Claimants,* the court of appeals for the Second Circuit found that in post-bankruptcy the bankruptcy court lacked jurisdiction on claims arising from property damage sustained from the removal of asbestos that was sold or manufactured by Manville. The court concluded that such issues were explicitly excluded from the post-confirmation jurisdiction of the bankruptcy court by the Plan. *See id.* at 34–35. Accordingly, the bankruptcy court was without jurisdiction in that case.

Although the plan in *Hospital and University Property Claimants* explicitly excluded the exercise of jurisdiction, an affirmative exclusion was neither central to the decision's holding nor required to preclude the granting of post-confirmation jurisdiction. To mandate that a plan actually demarcate those areas in which a bankruptcy court could not exercise post-confirmation jurisdiction would create a massive expansion in the jurisdictional grant while conflicting with section 1141(b). Requiring such language would run into severe tension with the constitutional and statutory limits placed on bankruptcy courts.

Plaintiffs point to several terms in the Plan that they contend provide jurisdiction. In particular, they focus on Article X of the Reorganization Plan. This article provides the bankruptcy court with continuing jurisdiction for several purposes such as:

G. To enforce and administer the provisions of the Plan and, to the extent expressly provided therein, the Exhibits thereto and the Annexes to the Exhibits;

. . . .

J. To determine such other matters as may be provided for in the Confirmation Order . . .;

K. To enforce all orders, judgments, injunctions and rulings entered in connection with the Cases; and

L. To enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan.

Manville Corporation, Second Amended and Restated Plan of Reorganization, art. 10, at C–36 to C–37 (Nov. 28, 1988). Plaintiffs also point to the Confirmation Order, which provides jurisdiction "for such purposes as may be necessary or useful to aid the confirmation and consummation of the Plan and implementation of the Plan as provided in the Plan." *In re Johns–Manville Corp.,* Bankruptcy No. 82 B 11656/76, ¶ 28, at 23–24 (Dec. 22, 1986); *see also id.* at 24–25 (listing a number of areas in which jurisdiction exists to elucidate aspects of the Plan).

Plaintiffs' reliance on this amorphous language in the Plan and Confirmation Order as a basis for continuing competence of the bankruptcy court is misplaced. This language should be read narrowly to ensure that the bankruptcy court's role is appropriately as limited as is practicable after confirmation. *See Zahn Assocs., Inc. v. Leeds Building Prods., Inc. (In re Leeds Building Prods.),* 160 B.R. 689, 691 n. 3 (Bankr.N.D.Ga.1993). None of these provisions contemplate the possibility that jurisdiction would provide a basis for the resulting Trust to sue third parties. The clauses speak in very general terms of future judicial action necessary to ensure that the Plan is not subverted.

Plaintiffs suggest that because the Trust's lack of funds harms the operation of the Plan, this litigation would further

the Plan's purpose by infusing the Trust with fresh capital. The mere lack of funds by the Trust is not enough to create jurisdiction under these provisions. If it were, any litigation in which the Trust could possibly be enriched would give jurisdiction to the bankruptcy court. *See also infra* Subsection IV.A.1.d.

To read the Plan's language as providing for such a wide swath of jurisdiction would emasculate the requirement that the Plan define the limit of post-confirmation jurisdiction. It would also raise serious questions about the constitutional limits on Congress's power to give authority to non-Article III bankruptcy courts. *See Northern Pipeline*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (plurality opinion); *In re Leeds Building Prods.*, 160 B.R. 689, 691–92 n. 3 (Bankr.N.D.Ga.1993) ("This Court has no power to reserve jurisdiction beyond what Congress has given or what is necessary to effectuate the plan of reorganization."); *Grimes v. Graue (In re Haws)*, 158 B.R. 965, 969 (Bankr.S.D.Tex.1993).

The language of the Plan does not come close to contemplating a suit such as the instant one. There is no need to reach the more difficult questions involving any constitutional limits on the scope of "related to" jurisdiction.

### 3. Future Claimants

While plaintiffs argue to the contrary, this analysis of lack of competence over the suit is not affected by the existence of future claimants. It is certainly true that one of the great problems in formulating the Plan and the resulting Trust was the existence of unknown future claimants. Yet their existence alone cannot create federal jurisdiction. This contention of the Trust is simply a more sophisticated version of the argument that because the Trust needs additional funds, jurisdiction should exist.

The existence of huge numbers of future claimants provides further evidence of the shortage of Trust funds. It does not explain why jurisdiction should exist in this proceeding as opposed to any litigation which creates the possibility for future enrichment of the Trust.

Plaintiffs' argument relying on future claims is undermined by the fact that despite widespread consideration of the effect of mass torts on bankruptcy, nothing has been done legislatively to enlarge bankruptcy jurisdiction over future claimants. *See, e.g.*, Willging, *supra*, 187 F.R.D. at 404–33; Conference on Mass Torts, *supra*, § 14 (discussing National Bankruptcy Review Commission's Proposal). Most scholars agree that legislation is necessary to deal with the difficult legal and factual problems raised by inchoate future claims. *See, e.g.*, Willging, *supra*, 187 F.R.D. at 404–33; Conference on Mass Torts, *supra*, § 14. This view reinforces the perception that post-confirmation competence of the bankruptcy courts in mass torts is severely limited.

It is argued by plaintiffs that a "broad reading of post-confirmation 'related to' jurisdiction is particularly appropriate in mass tort cases, such as the Manville bankruptcy." Pl. Supp. Mem. of L, at 9 (citing 8 Collier, *supra*, ¶ 1142.04[2], at 1142–48). Expansion of bankruptcy jurisdiction to meet the problems of mass torts with future claimants is a matter the legislature, not the courts, can address. Thus far Congress has refused to act.

### 4. The Bergstrom *Decision*

Plaintiffs rely heavily upon the Fourth Circuit's decision in *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 86 F.3d 364 (4th Cir.1996), to support their contention that jurisdiction exists. While portions of language of *Bergstrom* support plaintiffs' argument, the opinion is not controlling.

*Bergstrom* arose from the A.H. Robbins bankruptcy that resulted from massive litigation over the manufacturing and marketing of the Dalkon Shield contraceptive device. The case involved a dispute over the amount of additional attorneys' fees to be

paid after it was discovered that the trust would have a sizable amount of money after paying all of its claims. *See id.* at 367. The court of appeals found that the federal district court, which was sitting as a bankruptcy court, possessed jurisdiction both under the "arising in" and "related to" provisions of Section 1334(b).

As to the former provision, the *Bergstrom* court stated that the proceeding "would have no existence outside of the bankruptcy." *Id.* at 372 (quoting *In re Wood,* 825 F.2d 90, 97 (5th Cir.1987)). This portion of the decision turned on the unusual nature of the fee decision and, accordingly, is inapposite to the instant litigation. Not only was the fee award solely a product of the bankruptcy litigation, but, as the court of appeals pointed out, it was the earlier district court order that had "limit[ed] the percent that the plaintiffs may receive in fees out of these pro rata distributions." *Id.*

Although the instant suit seeks to expand the size of the Trust's assets, it does not directly arise from the existence of bankruptcy litigation. In fact, had bankruptcy litigation never taken place, nothing would have prevented Manville from attempting to implead the tobacco companies in litigation outside of the context of bankruptcy. While the *Bergstrom* fee award only existed because of the bankruptcy proceeding, the role of Tobacco was incidental at best to the Manville bankruptcy. This portion of *Bergstom* is hence inapposite to the instant case.

The *Bergstrom* court went on to find that even though the estate had been terminated with the confirmation of the Plan, "related to" jurisdiction existed as well. *See id.* at 372–73. It is the language in this portion of the opinion—in particular, the statement that the issue of attorneys' fees is "related to the administration of the Trust because it affects the amount that each claimant will receive"—that most strongly supports plaintiffs' position. *Id.* at 372. This language, however, is too broad to describe the scope of this jurisdic-

tional grant and is dicta that stands in conflict with relevant Second Circuit precedent, *i.e., Hospital and Univ. Property Claimants,* 7 F.3d at 34.

The critical language in *Bergstrom*—which seems to state that because the litigation affected the amount of money each claimant would receive, jurisdiction is created—cannot be followed. If it were, any tort or contract suit involving the Trust, regardless of when it arose, would fall under the "related to" grant because it would have the capacity to the expand or diminish the Trust's assets. Such a result would basically grant the bankruptcy court jurisdiction to adjudicate any lawsuit involving a post-bankruptcy trust. It would stand in marked contrast to the limited jurisdiction possessed by the non-Article III bankruptcy courts.

Moreover, *Bergstom* provides several factors in support of jurisdiction, making this expansive jurisdictional language unnecessary to the case's resolution. The *Bergstom* plan contained broad retention of jurisdiction provisions. *See* Georgene M. Vairo, *The Dalkon Shield Claimants Trust: Paradigm Lost (or Found)?,* 61 Fordham L.Rev. 617, 647 (1992). Based upon these provisions, the *Bergstrom* court found that the plan at issue granted continuing jurisdiction to the bankruptcy court. *See Bergstrom,* 86 F.3d at 373. This fact standing alone provides an adequate basis for a finding of jurisdiction. *See supra* Subsection IV.A.1.c. Once this finding was made, any further discussion of the jurisdictional question became dicta. Plaintiffs' reliance on *Bergstrom* is unpersuasive.

### 5. Supervision of the Trust

Plaintiffs contend that jurisdiction exists based on some general power to supervise the Trust, which was a product of the bankruptcy proceeding. This argument for broad-based jurisdiction cannot be accepted. A "post-confirmation bankruptcy court [only] retains jurisdiction

over matters concerning the implementation or execution of a confirmed plan." *Findley*, 129 B.R. at 794; *see also* 11 U.S.C. § 1142 (granting bankruptcy court limited power after confirmation "to direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan"). The power to supervise the Trust does not provide a general jurisdictional grant enabling the bankruptcy court to entertain any litigation that involves an entity that is a product of the Plan.

■ Even though the Trust arose from the bankruptcy proceeding, once created it was subject to the state law of trusts. *See Findley*, 982 F.2d at 734 ("Just as a reorganized corporation is subject to state law, so also is a trust that emerges from a plan of reorganization."); *In re Joint E. & S. Dist. Asbestos Litig.*, 878 F.Supp. at 479. A bankruptcy or district court does not possess a broad grant of power in perpetuity to protect a resulting trust governed by state law.

■ A trust created to effectuate a bankruptcy plan should be treated as is any other entity with the right to sue or be sued. Unless that entity comes within some special statutory exception, its position as a plaintiff in a federal court must be justified under diversity or federal question jurisdiction. Neither general nor special statutes provides a basis for exercise of jurisdiction in the present case.

### B. Other Jurisdictional Contentions

Plaintiffs raise two additional arguments in support of jurisdiction: (1) that then-Chief Judge Charles L. Brieant's 1990 order granting a judge of the Eastern District of New York judicial authority to act in Manville's reorganization gave him subject matter jurisdiction and (2) that the Second Circuit previously held that the district court has in rem or quasi in rem jurisdiction. Both contentions are without merit.

■ As to the former, the order of the Chief Judge merely allowed a judge of the district court for the Eastern District of New York to act as district judge in the Southern District of New York, with power to supervise and remove to the district court for the Southern District matters in the bankruptcy court for the Southern District. *See Findley*, 982 F.2d at 733. It neither did, nor could, enlarge the competence of this court beyond constitutional or statutory limitations.

■ The latter contention is equally unavailing. Both in rem and quasi in rem jurisdiction deal with personal and not subject matter jurisdiction. *See, e.g., Cargill, Inc. v. Sabine Trading & Shipping Co., Inc.*, 756 F.2d 224, 228–29 (2d Cir. 1985) (analyzing in rem and quasi in rem jurisdiction as matters of personal jurisdiction). Defendants' motion is granted because of the absence of competence, not because the court lacks personal jurisdiction over defendants.

### V. Application of Law to Facts

The Trust's substantive theory of the case requires a massive litigation against parties who had no part in the pre-bankruptcy, the bankruptcy or the post-bankruptcy activities of the Trust or Manville. There is no more federal court competence in this case relying on that theory than there would be if the Trust now sued IBM because its computer system failed to meet specifications in a contract entered into after 1988. While the instant case and IBM hypothetical would both have impacts on the Trust's finances, an independent jurisdictional basis is required. Under the present theory of the instant case, it is absent.

## VI. Conclusion

The case is dismissed. No costs or disbursements are ordered in view of the large role Tobacco has played in increasing the costs of the Trust.

SO ORDERED.