### In re PEGASUS GOLD CORPORATION, et al., Debtor.

**The State of Montana; the Montana Department of Environmental Quality; and Spectrum Engineering, Inc., Appellants,**

v.

**Harrison J. Goldin, in his capacity as Liquidating Trustee for the Pegasus Gold Corporation Liquidating Trust; and Reclamation Services Corporation, Appellees.**

**Bankruptcy No. BK–N–98–30088 (GWZ).**

**CV–N–02–0255–DWH (RAM).**

United States District Court, D. Nevada.

April 29, 2003.

### *ORDER*

HAGEN, District Judge.

Before the court is an appeal by the State of Montana, Montana Department of Environmental Quality ("DEQ"), and Spectrum Engineering, Inc. ("Spectrum") (collectively, "Appellants") from the bankruptcy court's March 29, 2002 order (Bankr. File # 59) denying their motion to dismiss plaintiffs' complaint. Appellees and plaintiffs below are Harrison J. Goldin, bankruptcy trustee for Pegasus Gold Corporation ("PGC"), and Reclamation Services Corporation ("RSC"), an entity created during the administration of the bankruptcy estate for the purpose of performing reclamation work at two mine sites run by a PGC affiliate in Montana. On December 5, 2002, appellants filed their opening brief (# 26). Appellees filed their answering brief (# 31) and appellants replied (# 35).

### I. *Factual Background*

On January 16, 1998, PGC and eighteen of its affiliates (collectively, "Debtors") commenced voluntary chapter 11 proceedings in the United States Bankruptcy Court for the District of Nevada. Because one of PGC's affiliates had engaged in mining operations at two mine sites in Montana, DEQ filed proofs of claim in PGC's bankruptcy proceedings pursuant to the Montana Metal Mine Reclamation Act, which requires mine operators to prepare a reclamation plan in connection with their mining operations and to post bonds as security for their reclamation obligations.

(*See* App. to Appellees' Br., Vol. 1(# 32), Tabs 19–22.)

According to the bankruptcy court and as demonstrated by the record below, the debtors and DEQ engaged in extensive negotiations regarding the financial responsibility for reclamation and water treatment work at two mines in Montana, known as the "Zortman Sites." (*See* Bankr. Ct. Order (Bankr.File # 59) at 3:12–24, App. Appellants' Opening Br. (# 26), Tab 1.) These negotiations involved both judicial and non-judicial settlement conferences, objections to the proposed disclosure statement and amendments thereto, negotiations with sureties, and objections to and active participation in the plan confirmation process. (*See id.;* App. Appellee's Br., Vol. 1(# 32), Tab 28; Vol. 2(# 33), Tabs 35, 37–38; and Vol. 3(# 34), Tab 52.) Ultimately, on December 4, 1998, the debtors and DEQ reached a settlement agreement, known as the "Zortman Agreement," which was approved by the bankruptcy court on December 22, 1998. (*Id.,* Vol. 2(# 33) at Tab 33.) Soon thereafter, the bankruptcy court confirmed the Second Amended Joint Liquidation Plan of Reorganization of Pegasus Gold Corporation et al. ("Plan"). (*Id.,* Vol. 3(# 34) at Tab 57.)

The Zortman Agreement and the Plan called for the creation of a new entity, RSC, to conduct the required reclamation and water treatment work at the Zortman sites on an interim basis, until the completion of a competitive bidding process. (*Id.* at Art. VIII, § 8.1; Vol. 2(# 33), Tab 33 at 1–2.) According to appellees, RSC was created in order to benefit the overall Plan goal of preserving the jobs of Debtors' employees to thereby maximize the possibility of creditor recovery. (Appellees' Br. (# 31) at 14:18–24.) The Plan embodied explicit language describing the incorporation of RSC and the arrangement be-

tween Debtors, DEQ, and RSC for funding interim reclamation activities. (*See* Plan at Art. VIII, § 8.1, App. Appellees' Br., Vol. 3(# 33), Tab 57.) Although not mentioned in the Zortman Agreement or Plan, appellees also contend that DEQ had represented to them that RSC would be given a preference in the competitive bidding process for the long-term reclamation work at the Zortman sites. (Am. Compl. at ¶ 6, App. Appellants' Opening Br.(# 26), Tab 2.) In addition, the Plan contained a provision in which the bankruptcy court retained jurisdiction "[t]o construe and to take any action authorized by the Code and requested by such Debtor, the Liquidating Trustee, or any other party in interest to enforce this Plan and the documents and agreements filed in connection with this Plan, issue such orders as may be necessary for the implementation, execution, and consummation of this Plan." (Plan at Art. X, § 10.1(b), App. to Appellees' Br., Vol. 3(# 33), Tab 57.)

Appellees claim that soon after RSC commenced reclamation activities, disputes arose between DEQ and RSC regarding budgets, payments, and timing of the competitive bidding procedure for a long term contract. (Appellees' Br. at 20:12–20.) In addition, DEQ terminated RSC's interim contract and then hired Spectrum to perform the reclamation and water treatment work using RSC's employees. (*Id.* at 20:21–22.) Without its trained employees and cash flow to perform reclamation work, RSC was rendered defunct. (*Id.* at 2:17–26.) Appellees allege that DEQ never intended to follow through with the Zortman Agreement and that DEQ's actions caused the demise of RSC, thereby interfering with the reorganization plan. (*Id.* at 20:9–22.)

As a result of these events, the trustee and RSC brought a civil proceeding in the bankruptcy court asserting eleven claims for relief: (1) Trustee's and RSC's claims against DEQ for breach of the Plan and Zortman Agreement; (2) Trustee's and RSC's claims against DEQ for breach of the covenants of good faith and fair dealing; (3) RSC's claim against DEQ for breach of the Master Agreement[1]; (4) RSC's claim against DEQ for unjust enrichment; (5) RSC's claim against DEQ for promissory estoppel/equitable estoppel; (6) RSC's claim against DEQ for fraud in the inducement; (7) Trustee's claim against DEQ for fraud in the inducement; (8) RSC's claim against DEQ and Spectrum for tortious interference with third party relations; (9) RSC's claim against DEQ for intentional interference with prospective economic advantage; (10) RSC's claim against DEQ and spectrum for conversion; and (11) RSC's claim against DEQ for defamation. DEQ and Spectrum filed a motion to dismiss on the grounds that the bankruptcy court lacked subject matter jurisdiction over the claims and that DEQ had sovereign immunity under the Eleventh Amendment. After the bankruptcy court denied this motion, DEQ and Spectrum filed the instant appeal in this court.

## II. *Analysis*

### A. *Standard of Review*

▮ When reviewing bankruptcy court decisions, the district court functions as an appellate court and reviews the bankruptcy court's findings of fact under a "clearly erroneous" standard and the

---

**1.** The Master Agreement is the name given to the formal contract for RSC's interim services entitled, "DEQ Agreement with Reclamation Services Corporation," completed on or about April 28, 1999. (*See* Pls.' Am. Compl. at ¶ 41, App. to Appellants' Opening Br. (# 26), Tab 2.)

bankruptcy court's conclusions of law under a *de novo* standard. *In re Global West. Dev. Corp.*, 759 F.2d 724, 726 (9th Cir.1985). Matters of jurisdiction are conclusions of law that warrant a *de novo* standard. *Matter of Lockard*, 884 F.2d 1171, 1174 (9th Cir.1989). Questions of Eleventh Amendment immunity are also reviewed *de novo*. *In re Lazar*, 237 F.3d 967, 974 (9th Cir.2001).

### B. Subject Matter Jurisdiction

#### 1. Bankruptcy Court's Retention of Jurisdiction

■ The Plan provision in which the bankruptcy court explicitly retained jurisdiction cannot serve as the sole basis of subject matter jurisdiction. A bankruptcy court "cannot establish jurisdiction merely by inserting [a provision to that effect] into a confirmation order, [since it has] no power to reserve jurisdiction beyond what Congress has given or what is necessary to effectuate the plan of reorganization." *Matter of Leeds Bldg. Prods., Inc.*, 160 B.R. 689, 691 n. 3 (Bankr.N.D.Ga.1993); *see In re Brass Corp.*, 301 F.3d 296, 303 (5th Cir.2002) ("[T]he source of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor the express terms of the Plan. The source of the bankruptcy court's jurisdiction is 28 U.S.C. §§ 1334 and 157"), *quoting United States Tr. v. Gryphon at the Stone Mansion, Inc.*, 216 B.R. 764, 769 (W.D.Pa. 1997). As a result, any language in the confirmation decree that seeks to retain jurisdiction is not sufficient on its own to confer jurisdiction on the bankruptcy court.

#### 2. Jurisdiction under § 1142

■ Likewise, the bankruptcy court's jurisdiction can not stem from 11 U.S.C. § 1142 because this statutory provision can not serve as a source of jurisdiction separate from § 1334. Section § 1142(b) allows the bankruptcy court to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of a lien, that is necessary for the consummation of the plan." Although this section allows the bankruptcy court to issue an order necessary for implementation of the plan, it does not serve as a basis for postconfirmation jurisdiction over civil proceedings. *See Brass*, 301 F.3d at 305–06. Rather, bankruptcy jurisdiction is governed exclusively by 28 U.S.C. § 1334 whether the matter at issue arises before or after confirmation of a plan. *See id.* at 305; *see also* 8 LAWRENCE P. KING, ET AL., COLLIER ON BANKRUPTCY ¶ 1142.02[1] (15th ed. rev.1996) ("Bankruptcy jurisdiction is governed by 28 U.S.C. § 1334; this is so whether the matter at issue arises before or after confirmation of a plan. Confirmation does not alter the basic jurisdictional analysis applicable to bankruptcy courts."). Accordingly, the suggestion by appellees that § 1442 grants authority in the bankruptcy court to hear their civil matter is unavailing.

#### 3. "Related to" Jurisdiction under 28 U.S.C. § 1334(b)

■ Because the instant dispute bears directly on the implementation and execution of PGC's reorganization plan, the bankruptcy court correctly assumed subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b). Under this provision, the bankruptcy court has original-but not exclusive-jurisdiction over "any or all proceedings arising under or arising in or related to a case under title 11." *Id.* While admonishing that a bankruptcy court's "related to" jurisdiction is "not limitless," the

Supreme Court has stressed that Congress's "choice of words [in the statute] suggests a grant of some breadth." *Celotex Corp. v. Edwards,* 514 U.S. 300, 307–08, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). Furthermore, the Court added that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Id.* at 308, 115 S.Ct. 1493, *quoting Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984), *overruled on other grounds, Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 134–35, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995). The test used in the Ninth Circuit for whether a civil proceeding is related to bankruptcy is "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor,* 743 F.2d at 994, *adopted by In re Fietz,* 852 F.2d 455, 457 (9th Cir.1988). Stated another way, "an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor,* 743 F.2d at 994.

Once a confirmation order has issued, however, courts have been fairly reluctant to allow a bankruptcy court to maintain jurisdiction since, technically, the bankruptcy estate no longer exists. *See In re Craig's Stores of Texas, Inc.,* 266 F.3d 388, 391 (5th Cir.2001); *In re Fairfield Cmtys., Inc.,* 142 F.3d 1093, 1095 (8th Cir.1998). Nonetheless, using either a broad test similar to the one enunciated in *Pacor* or a narrower one that focuses on the bankruptcy court's necessary oversight in ensuring that the confirmed plan is carried out, numerous decisions have preserved post-confirmation jurisdiction in the bankruptcy court. *See, e.g., In re Petrie Retail,*

*Inc.,* 304 F.3d 223, 230 (2d Cir.2002) (finding post-confirmation jurisdiction over debtor's assignee's motion seeking to enforce confirmation orders regarding lease administered in bankruptcy estate); *In re U.S. Brass Corp.,* 301 F.3d 296, 303–05 (5th Cir.2002) (finding post-confirmation jurisdiction over motion requesting approval of settlement agreement that violated provisions of confirmation plan); *United States Tr. v. Gryphon at the Stone Mansion, Inc.,* 166 F.3d 552, 555–56 (3d Cir.1999) (finding post-confirmation jurisdiction to hear claim for fees by trustee).

Although the Ninth Circuit has not spoken on whether a bankruptcy court has post-confirmation jurisdiction under the "related to" language of § 1334, *Pacor* has been applied elsewhere to post-confirmation disputes. *See Gryphon,* 166 F.3d at 555–56; *Donaldson v. Bernstein,* 104 F.3d 547, 553 (3d Cir.1997). Since the bankruptcy estate no longer exists after the plan has been confirmed, however, the *Pacor* test has been adapted so that the bankruptcy court maintains jurisdiction if the civil proceeding has "a conceivable effect on the debtor's ability to consummate the confirmed plan ..." *Eubanks v. Esenjay Petroleum Corp.,* 152 B.R. 459, 463–64 (E.D.La.1993). A similar test applied in *Donaldson* assesses whether a proceeding "significantly affect[s] consummation of the plan as confirmed." 104 F.3d at 553, *quoting In re Haws,* 158 B.R. 965, 970 (Bankr.S.D.Tex.1993). Moreover, any subsequent civil proceeding must have a "sufficient nexus" to the bankruptcy case. *Donaldson,* 104 F.3d at 553.

Under the broad "related to" standard articulated in *Eubanks* and *Donaldson,* the bankruptcy court unequivocally has jurisdiction to hear appellees' claims against DEQ. Any alleged breach of the Plan and Zortman Agreement by DEQ, breach of covenants of good faith and fair dealing,

and fraud in entering those agreements clearly have a "conceivable effect" on PGC's ability to consummate the confirmation plan. *See Eubanks,* 152 B.R. at 463–64. RSC's failure, and its inability to retain Debtors' employees on account of appellants' alleged dealings, undermine the Plan's objectives for reorganization and the payment of creditors and therefore satisfy the "conceivable effect" benchmark set out in *Pacor* and *Eubanks. See id.; Pacor,* 743 F.2d at 994; *United States Tr. v. Gryphon at the Stone Mansion, Inc.,* 166 F.3d 552, 555–56 (3d Cir.1999). These events also significantly affected the consummation of the confirmed plan by depriving Debtors of the means by which they would fulfill their reclamation obligations and maintain their employees as conceived by the Plan, thereby "implicat[ing] the integrity of the bankruptcy process." *Donaldson,* 104 F.3d at 553. These facts demonstrate the necessary close nexus between appellees' tort and contract claims and the bankruptcy proceeding. *See id.*

█ Even those courts which have been uncomfortable applying the sweeping *Pacor* standard for post-confirmation disputes would nonetheless find that the bankruptcy court's jurisdiction continues after confirmation at least "to protect its [confirmation] decree, to prevent interference with the debtor's plan of reorganization, and to otherwise aid in its execution." *In re Dilbert's Quality Supermarkets, Inc.,* 368 F.2d 922, 924 (2d Cir.1966); *see Falise v. Am. Tobacco Co.,* 241 B.R. 48, 57 (E.D.N.Y.1999); *see also In re Leeds Bldg. Prod., Inc.,* 160 B.R. 689, 691 (Bankr. N.D.Ga.1993) (concluding that the bankruptcy court's role post-confirmation is limited to matters involving the execution or interpretation of the plan's provisions, and to disputes requiring the application of bankruptcy law). A similar test was artic-ulated by the Fifth Circuit, which held that a bankruptcy court has jurisdiction over a civil proceeding if the litigated matter "bear[s] on the interpretation or execution of the debtor's plan." *In re Craig's Stores of Texas, Inc.,* 266 F.3d 388, 391 (5th Cir. 2001).

Using the narrower standard of *Dilberts or Craig's,* the bankruptcy court still commands subject matter jurisdiction over appellees' claims. The alleged conduct by DEQ and Spectrum interferes with the Debtors' plan for reorganization, as evidenced by the failure of RSC and the loss of its employees to Spectrum. *See Dilbert's,* 368 F.2d at 924. Moreover, it bears on the execution of the Plan because DEQ's termination of RSC's interim contract and Spectrum's successful recruitment of RSC's employees effectively obstructed that part of the Plan developed to fulfill Debtors' reclamation obligations and maintain their employees on the payroll. *See Craig's,* 266 F.3d at 391. Accordingly, since appellees' claims against DEQ derive from the impediments allegedly constructed by appellants, the bankruptcy court had related to jurisdiction over appellees' claims one through eight. The court specifically addresses each claim below:

### a. First Claim for Relief: Breach of Plan and Zortman Agreement

Any alleged breach of the Zortman Agreement and Plan is necessarily related to the bankruptcy because it obstructs the execution of the Plan. *See Dilbert's,* 368 F.2d at 924.

### b. Second Claim for Relief: Breach of Covenants of Good Faith and Fair Dealing

DEQ's alleged breach of the covenants of good faith and fair dealing by denying RSC the opportunity to fully perform the agreed-upon interim reclamation services

interfered with the Plan's mandates, so the bankruptcy court had related to jurisdiction. *See Craig's*, 266 F.3d at 390.

### c. Third Claim for Relief: Breach of Master Agreement

Although the Master Agreement was entered into after confirmation of the Plan, it simply formalized the agreement already binding on DEQ by the Zortman Agreement and Plan. Since it was the Plan that called for the creation of RSC, the Master Agreement would not exist but for the obligations created in the Plan. (*See* Am. Compl. at ¶ 41, App. Appellants' Opening Br. (# 26), Tab 2.) As a result, an alleged breach of the Master Agreement impedes the execution of the Plan, thereby evoking the bankruptcy court's jurisdiction. *See Dilbert's*, 368 F.2d at 924.

### d. Fourth Claim for Relief: Unjust Enrichment

Just as DEQ's alleged breach of the Zortman Agreement and Plan bestow jurisdiction on the bankruptcy court, the benefit allegedly accrued by DEQ from this breach warrants bankruptcy court jurisdiction as well. Any non-payment to RSC for services rendered hinders the successful execution of the Plan. *See Craig's*, 266 F.3d at 390.

### e. Fifth Claim for Relief: Promissory Estoppel/Equitable Estoppel

Alleged misrepresentations on the part of DEQ regarding obtaining additional funding to pay RSC for continuing reclamation work bore directly on the ultimate failure of RSC and its ability to carry out

its objectives as set forth in the Plan. The bankruptcy court's jurisdiction over this claim is therefore appropriate. *See id.*

### f. Sixth and Seventh Claims for Relief: Fraud in the Inducement

Any alleged fraud on the part of DEQ in inducing RSC into entering the Letter Agreement [2] and/or Master Agreement relates to PGC's bankruptcy in that those agreements simply formalized the obligations already set forth in the Zortman Agreement and the Plan. (*See* Am. Compl. at ¶ 41, App. Appellants' Opening Br. (# 26), Tab 2.) Similarly, any alleged fraud by DEQ in inducing PGC to enter into the Zortman Agreement and the Plan under the belief that RSC would be paid for reclamation services relates to the bankruptcy because the misrepresentations, if true, would destine the Plan to failure at the outset. If, as appellees allege, DEQ never intended to fulfill its obligations under the Plan, thereby obstructing implementation and execution of the Plan, bankruptcy jurisdiction is necessarily implicated. *See id.*

### g. Eighth Claim for Relief: Tortious Interference

The allegation that DEQ intended for Spectrum to take over the reclamation work at the Zortman sites, despite its obligations to RSC and knowledge of RSC's role in carrying out the Plan, calls for bankruptcy jurisdiction over the tortious interference claim against Spectrum. Tortious interference, even by a party that was not privy to the bankruptcy proceeding, bears directly on the Plan's execution, so jurisdiction lies in the bankruptcy court

---

**2.** RSC and DEQ entered into the Letter Agreement on January 15, 1999, pursuant to which RSC agreed to perform interim reclamation and water treatment at the Zortman sites in exchange for DEQ's promise to pay RSC for the work. The Letter Agreement served as an interim agreement that assured RSC would be paid for its work while the parties drafted a formal contract, known as the Master Agreement. (Am. Compl. at ¶¶ 38–40, App. Appellants' Opening Br. (# 26), Tab 2.)

to protect the confirmation decree. *See Craig's*, 266 F.3d at 391.

### 4. Incongruity of Appellants' Analysis

Appellants' arguments that post-confirmation jurisdiction cannot lie because any obligations imposed by the Zortman Agreement did not exist in the Plan itself or were superceded by the Master Agreement obfuscate the reality that RSC's existence and its effectuation of Debtors' reclamation obligations were material elements of the Plan. (Plan at Art. VIII, § 8.1, App. Appellees' Br., Vol. 3(# 34), Tab 57.) By confining their focus to the lack of explicit obligations imposed by specific Plan language, appellants fail to look at the greater purpose of the Plan. DEQ's termination of RSC's interim contract as well as Spectrum's recruitment of RSC employees thwarted the bankruptcy court's successful execution of the Plan. Accordingly, the bankruptcy court can assume subject matter jurisdiction over appellees' civil proceeding to protect its confirmation decree, notwithstanding the lack of explicit "obligations" imposed on DEQ by the Plan. *See Dilbert*, 368 F.2d at 924.

Appellants' reliance on *Craig's* and *Falise* does not alter this conclusion. Appellants emphasize that in *Craig's*, an agreement entered into by the parties before the bankruptcy could not serve as a basis for the bankruptcy court's jurisdiction over a breach of that agreement following confirmation of the decree. (*See* Appellants' Opening Br. (# 26) at 19:26–20:4.) In *Craig's*, the contested agreement had been in place for four years before the debtor sought Chapter 11 bankruptcy protection. 266 F.3d at 389. The contract involved the use of a bank (the creditor) by Craig's (the debtor) to administer Craig's in-house private label credit card program and thereby assist in financing Craig's operations by buying the company's receivables. *Id.* The contract was assumed as part of the debtor's reorganization plan, and the civil suit alleging its breach arose eighteen months after confirmation. *See id.* Since the dispute in *Craig's* involved one of many claims made on the bankruptcy estate, rather than an entity that literally arose from the bankruptcy settlement and confirmation itself, *Craig's* is distinguishable.

Appellants fail to recognize that, unlike the agreement at issue in *Craig's*, the Zortman Agreement was an integral part of the bankruptcy administration. It was a necessary benchmark that facilitated the achievement of a final confirmation decree. It was not merely one of many contracts that had to be thrown into debtor's reorganization "soup" among the claims of numerous creditors. Rather, the Zortman Agreement stemmed from the bankruptcy itself. This distinction from the facts in *Craig's* is marked, and it is enough to confer jurisdiction on the bankruptcy court after confirmation of the Plan.

In addition, the *Craig's* court noted that, in the case before it, "no facts or law deriving from the reorganization or the plan was necessary to the claim asserted by Craig's against the Bank." *Id.* at 391. Although appellants argued to the contrary, facts and law abound in the instant case that flow from the reorganization and plan on which appellees' claims are based. First, RSC itself would not exist but for the reorganization. (*See* Plan, Art. VIII, § 8.1, App. Appellees' Br., Vol. 3(# 34), Tab 57.) Second, since RSC was created as part of the reorganization, the claims stemming from the events leading to its failure, although couched as state law claims, could not exist but for the reorganization and plan. Appellants incorrectly assert that "[n]one of [appellees'] claims involve the implementation, execution, or consummation of the plan" (Appellants'

Opening Br. (# 26) at 20:8). Indeed, appellees' claims would not exist at all had the plan been implemented and executed according to its terms. As a result, the instant case is distinguishable from *Craig's*.

Moreover, the Fifth Circuit has since found post-confirmation jurisdiction even under the narrow rule set forth in *Craig's*. In *In re U.S. Brass Corp.*, the Fifth Circuit concluded that the bankruptcy court had jurisdiction to deny a motion to approve a settlement between the parties when the confirmation plan had specifically called for the claims at issue to be litigated in a court of competent jurisdiction. 301 F.3d 296, 305 (5th Cir.2002). The panel found that the motion "pertain[ed] to the plan's implementation or execution and therefore satisfies the *Craig's Stores* test for post-confirmation jurisdiction." *Id.* As in the instant case, the dispute in *Brass* arose from a term in the confirmation plan itself. *See id.* at 300. Further undermining appellants' reliance on *Craig's*, the plan provisions in *Brass* did not set forth any obligations on the parties but rather simply preserved the defenses of certain parties and "formalized a method for resolving [certain] claims." *Id.* Similarly, PGC's Plan sets out a method through which the Debtors could satisfy their reclamation obligations through the establishment of RSC and its interim contract with DEQ. (*See* Plan, Art. VIII, § 8.1, App. Appellees' Br., Vol. 3(# 34), Tab 57.)

Appellants' reliance on *Falise* is equally fruitless because the claims raised in that case were only tenuously connected to the initial administration of the bankruptcy estate. *Falise v. Am. Tobacco Co.*, 241 B.R. 48, 57 (E.D.N.Y.1999). The litigation in *Falise* arose years after the bankruptcy plan had been confirmed and the case closed. *Id.* In it, the trust sought to sue tobacco companies who had not been parties to the original bankruptcy proceedings. *Id.* at 54. In contrast, the current dispute arose almost immediately after the confirmation, involves an entity created by the Plan, and seeks to remedy alleged violations of an agreement by a creditor at the expense of the estate. (*See* Am. Compl. at ¶¶ 12, 15, 37, App. Appellants' Opening Br. (# 26), Tab 2.) While this court agrees with the reasoning in *Falise* that "the mere possibility of increasing the size of the Trust's assets post-confirmation is insufficient to create jurisdiction," jurisdiction in the instant case stands on other footing. 241 B.R. at 58. As a result, *Falise* is of no assistance to appellants and the bankruptcy court correctly retained jurisdiction under § 1334, as set forth in the analysis above.

### 5. Supplemental Jurisdiction

Appellants' challenge to the bankruptcy court's supplemental jurisdiction is equally unavailing because the law of this circuit authorizes the application of 28 U.S.C. § 1367 to bankruptcy courts. Section 1367 provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The Supreme Court has articulated that the basic inquiry regarding supplemental jurisdiction is whether (1) there is a "common nucleus of operative fact[s]" and (2) the parties ordinarily would be expected to resolve the matter in one judicial proceeding. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). "Supplemental jurisdiction extends over state claims brought against a party even when that party was not subject to the federal claim primarily at issue." *Davis v. Courington*, 177 B.R. 907, 912 (9th Cir. BAP 1995). A bankrupt-

cy court can exert supplemental jurisdiction pursuant to § 1367 over even tenuously associated state law claims when its subject matter jurisdiction over the federal claims stems from "related to" jurisdiction. *See Security Farms v. Int'l Broth. of Teamsters,* 124 F.3d 999, 1009 n. 5 (9th Cir.1997). The Ninth Circuit has recognized that supplemental jurisdiction under § 1367 can be invoked by the bankruptcy courts in other cases as well. *See In re Kieslich,* 258 F.3d 968, 970 (9th Cir.2001); *In re Carraher,* 971 F.2d 327, 328 (9th Cir.1992); *Davis,* 177 B.R. at 912.

■ Appellants' arguments to the contrary and their use of Fifth Circuit authority is unpersuasive. The law of the Ninth Circuit is unambiguous that a bankruptcy court can exercise supplemental jurisdiction over state law claims when its basis for federal jurisdiction is "related to" jurisdiction under § 1334. *See Security Farms,* 124 F.3d at 1009 n. 5. Given this clear instruction, this court sees no reason to look outside the circuit for guidance. As a result, supplemental jurisdiction can be exercised by a bankruptcy court. This court addresses below whether it is applicable to appellees' Ninth, Tenth, and Eleventh Claims for Relief.

### a. Ninth Claim for Relief: Intentional Interference with Prospective Economic Advantage

The allegation that DEQ intentionally interfered with the ability of RSC to competitively bid on a long-term reclamation contract arises from the common nucleus of operative facts surrounding the negotiation of the Zortman Agreement and Plan and alleged breaches of those agreements. In addition, the claim is one that would normally be brought in the same proceeding as breach claims. As a result, the bankruptcy court had supplemental juris-

diction over the Ninth Claim for Relief. *See Gibbs,* 383 U.S. at 725, 86 S.Ct. 1130.

### b. Tenth Claim for Relief: Conversion

Appellees' claim that DEQ and Spectrum converted RSC's business to their own benefit likewise stems from the same core facts and would be brought in the same proceeding as their claims for breaches of the Zortman Agreement and Plan. The alleged conversion of RSC's business contributed to RSC's demise, thereby implicating the Plan. Accordingly, the bankruptcy court has supplemental jurisdiction over the claim. *See id.*

### c. Eleventh Claim for Relief: Defamation

The contention that DEQ defamed RSC in a media campaign and unlawfully construed the true set of circumstances surrounding the reclamation funding also arises from the same facts giving rise to the claim for breach of the Zortman Agreement and Plan. If the alleged defamation in fact occurred and contributed to RSC's ultimate failure, it undermined the successful implementation of the Plan. Since this claim would normally be brought in the same proceeding and judicial economy warrants it, the bankruptcy court has supplemental jurisdiction over it. *See id.; In re Carraher,* 971 F.2d 327, 328 (9th Cir.1992).

### 6. Rescission

Because appellants never challenged rescission of either the Zortman Agreement or the Plan as a remedy below, this issue was not preserved for appeal. If a party fails to raise an objection to an issue in the court below, it waives the right to challenge the issue on appeal. *See Doi v. Halekulani Corp.,* 276 F.3d 1131, 1141 (9th Cir.2002). Nowhere in their motion to dis-

miss the complaint did appellants dispute rescission as a potential remedy. (See Defs.' Mot. Dismiss, App. Appellants' Opening Br., Tab 3.) As a result, they can not raise it here. See Doi, 276 F.3d at 1140. Even if appellants had challenged the rescission remedy below, having determined that jurisdiction existed in the bankruptcy court for the reasons outlined above, the possibility that either the Zortman Agreement or the Plan might be rescinded need not serve as a jurisdictional basis in this court.

### 7. Judicial Estoppel

■■■■ Appellants' contention that appellees should be judicially estopped from claiming fraud in the inducement is meritless because appellees have not taken inconsistent positions before the court. Judicial estoppel "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir.2001). To determine if this equitable doctrine should be invoked, a court should analyze whether (1) a party's position is "clearly inconsistent" with its previous position; (2) that party has succeeded in persuading a court of the earlier position; and (3) the party seeking to assert the inconsistent position would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. at 782–83. Here, appellees have not taken any position that contradicts one taken in front of the bankruptcy court. Their claim that DEQ acted in bad faith by not being committed to its obligations under the Zortman Agreement when it negotiated and entered into the agreement does not conflict with their earlier belief that the agreement had been negotiated in good faith. To apply judicial estoppel when a party later discovers a fact not known when it took the former position would essentially award deceptive behavior in contract negotiations. The doctrine of judicial estoppel was developed to prevent parties from "playing fast and loose with the courts" and not from challenging fraudulently negotiated contracts. See id. at 782. Consequently, it does not apply to the instant action.

### 8. Collateral Estoppel

■■■■ Similarly, the issue at hand does not invite the application of collateral estoppel because the parties never litigated the issue of DEQ's alleged misrepresentation in the bankruptcy proceeding. Issue preclusion "bars the relitigation of issues actually adjudicated in previous litigation between the same parties." Littlejohn v. U.S., 321 F.3d 915, 923 (9th Cir. 2003). A party invoking issue preclusion must demonstrate that: (1) the issue at stake is identical to an issue raised in the prior litigation; (2) the issue was actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment in the earlier action. Id. Issue preclusion is inappropriate where the parties have not had a full and fair opportunity to fully litigate the merits of an issue. See Allen v. McCurry, 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). In the instant case, the parties stipulated in the bankruptcy proceeding that they entered into the Zortman Agreement in good faith. (See Joint Stip. Approve Settlement Agreement, App. Appellees' Br., Vol. 2(# 33), Tab 33.) Appellees now claim that subsequent behavior by DEQ suggests that the agency masked its real intentions in front of the bankruptcy court. (Am. Compl. at ¶¶ 7–9, App. Appellants' Opening Br. (# 26), Tab 2.) Since this issue was never actually litigated, col-

lateral estoppel does not apply. *See Allen,* 449 U.S. at 95, 101 S.Ct. 411.

## C. Sovereign Immunity

 Because the instant action arises out of the same transaction or occurrence as DEQ's proof of claim in Debtors' bankruptcy proceeding, the agency can not now hide behind a sovereign immunity defense. When a state files a proof of claim before a bankruptcy court, "it waives any immunity which it otherwise might have had respecting the adjudication of the claim." *Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947). The Ninth Circuit expanded on *Gardner* to hold that "when a state files a proof of claim in a bankruptcy proceeding, the state waives its Eleventh Amendment immunity with regard to the bankruptcy estate's claims which arise from the same transaction or occurrence as the state's claim." *In re Lazar,* 237 F.3d 967, 978 (9th Cir.2001), *accord In re Harleston,* 275 B.R. 546, (9th Cir. BAP 2002). To determine whether a trustee's claims against a state arise out of the same transaction or occurrence as the state's proofs of claims in the applicable bankruptcy proceeding, the Ninth Circuit uses the "logical relationship" test of Fed.R.Civ.P. 13(a). *See Lazar,* 237 F.3d at 979, *citing In re Pinkstaff,* 974 F.2d 113, 115 (9th Cir.1992). Appellants assert that (1) the tort and contract claims against them are not logically related to their proofs of claim filed in PGC's bankruptcy; (2) plaintiffs' claims can not satisfy the logical relationship test because they are not analogous to compulsory counterclaims; and (3) their waiver of immunity in the bankruptcy proceeding does not extend to a separate civil suit brought by the trustee and RSC. (Appellants' Opening Br. (# 26) at 10:4–14:18.) The court addresses each of these contentions in turn:

### 1. Logical Relationship Test

 Because the same core facts served as a basis for DEQ's proofs of claims and the Zortman Agreement which they allegedly breached, the logical relationship test warrants denial of sovereign immunity. "A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant." *Pinkstaff,* 974 F.2d at 115. Appellants contend that their proofs of claims rested solely on the adequacy of Debtors' reclamation bonds so that appellees' tort and contract claims in the instant action are not logically related. (*See* Appellants' Opening Br. (# 26) at 8:19–24.) Notwithstanding this skewed characterization of the nature of DEQ's proofs of claims in Debtors' bankruptcy proceeding, DEQ's argument can not eclipse the fact that, in seeking additional bonding for reclamation of Debtors' mine sites, it was simply one of many creditors hoping for a piece of the bankruptcy estate. (*See* Tr. of August 11, 1998 Hearing of Bankr.Ct., App. to Appellees' Br., Vol. 1(# 32), Tab 18 at 188:10–12, finding that "the only interest that the State has regarding the bond is a pecuniary interest.") Although it narrowly couched its claims as simply "concern[ing] the adequacy of debtors' reclamation bonds," DEQ cannot overcome the fact that, similar to other creditors, what it sought to reap from the bankruptcy estate was money. (*See id.*) The obligations imposed on DEQ by the Zortman Agreement and affirmed by the confirmation decree stemmed directly from the state's pecuniary claims against the estate. (*See id.*) Thus, DEQ's contention that "there is not a single factual or legal issue which is arguably common to both the matters asserted in DEQ's proofs of claim

and the factual allegations of plaintiffs' complaint" is a gross distortion of the facts. (*See* Appellants' Opening Br. (# 26) at 10:6–8.) Indeed, appellees' tort and contract claims derive from DEQ's alleged failure to comply with the mandates of the bankruptcy court. (*See* Plan, Art. VIII, § 8.1, App. Appellees' Br., Vol. 3(# 34), Tab 57.) Clearly, the operative facts-i.e. the submission of claims against the bankruptcy estate, the manner in which they were settled, and the alleged breach of the settlement agreement-served as the basis for both DEQ's proofs of claims and appellees' subsequent suit against DEQ. As a result, the logical relationship test is satisfied here.

### 2. Compulsory Counterclaim Analogy

 Appellants also argue that even if the two claims are logically related, the test set out in *Pinkstaff* and *Lazar* was only meant to apply to a counterclaim or its equivalent, which does not exist in the instant case. Although *Lazar* invoked the Rule 13(a) test, nowhere in the decision is the rule's application within the bankruptcy context limited to counterclaims. *See* 237 F.3d 967, 979 (9th Cir.2001). The problem appellants raise lies in the fact that if the logical relationship test is applied to claims that are not analogous to counterclaims and which seek damages in excess of recoupment, the constitutional prohibition on damage claims against sovereign states would be violated. *See Lapides v. Bd. of Regents Univ. Sys. of Georgia*, 535 U.S. 613, 620, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002). The *Lazar* court explicitly left this issue open because, in the facts before that panel, the claims against the state did not exceed the amount of the state's initial proofs of claims against the bankruptcy estate. 237 F.3d at 978–79. Subsequently, the Ninth Circuit Bankruptcy Appellate Panel rejected the argument that a state's waiver of sovereign immunity must be limited to the relief it sought in the claims resolution process. *In re Harleston*, 275 B.R. 546, 551 (9th Cir. BAP 2002). In other words, the *Harleston* court concluded, an ancillary adversary proceeding for affirmative relief against the state (i.e. one with damages in an amount greater than that for which the state filed proofs of claims) does not exceed the scope of a sovereign immunity waiver. *Id.* The Supreme Court recently ratified this notion: "The principle enunciated in those cases [that stand for the principle that a state that invokes a federal court's jurisdiction waives immunity] did not turn upon the nature of the relief sought. And that principle remains sound as applied to suits for money damages." *Lapides*, 535 U.S. at 620, 122 S.Ct. 1640. Accordingly, RSC and the trustee's suit for damages is within the ambit of DEQ's waiver in the bankruptcy proceeding. *See id.*

### 3. Application of Waiver to Separate Civil Suit

 Finally, appellants argue that their waiver of immunity stemming from filing proofs of claims in the bankruptcy proceeding can not be extended to an independent civil suit brought by the trustee and RSC. *Lazar* itself found a waiver of sovereign immunity in a mandamus adversary proceeding against the state brought by a bankruptcy trustee. 237 F.3d at 980. In addition, the Bankruptcy Appellate Panel of the Ninth Circuit held that filing a proof of claim waived a state's immunity not only with respect to adjudication of its claim and any objections thereto, but also with respect to an adversary proceeding brought by the debtor for determination of dischargeability of state income tax debt. *In re Harleston*, 275 B.R. 546 (9th Cir. BAP 2002). The panel concluded that "when a state waives immunity as to one action, its waiver extends to ancillary suits to enforce orders entered in that action." *Id.* at 552–53, *citing Gunter v. Atl. Coast*

*Line R.R. Co.*, 200 U.S. 273, 292, 26 S.Ct. 252, 50 L.Ed. 477 (1906) (holding that "the proposition that the Eleventh Amendment ... control[s] a court of the United States in administering relief, although the court was acting in a matter ancillary to a decree rendered in a cause over which it had jurisdiction, is not open for discussion"). Moreover, under analogous circumstances, the Ninth Circuit determined that by participating in an arbitration proceeding pursuant to a federal statute, a state waived sovereign immunity not only to arbitral awards but also to federal suits to enforce such awards. *Premo v. Martin*, 119 F.3d 764, 769 (9th Cir.1997). Appellants' reliance on *Kokkonen* is inapposite because the Supreme Court found in that case that the facts supporting the claims that led to a settlement agreement and those underlying the claim that the settlement agreement was breached "have nothing to do with each other." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). In contrast, as discussed above, appellees' claims bear a close nexus to the facts underlying the bankruptcy decree, thereby evincing a waiver.

Guided by this authority, this court finds that DEQ's waiver extends to the civil suit brought by RSC and the trustee to enforce the provisions of the Zortman Agreement and the Plan. If DEQ were allowed to hide behind the immunity shield now, the bankruptcy court would be deprived of its jurisdiction to enforce the confirmation decree. *See Gunter*, 200 U.S. at 292, 26 S.Ct. 252. Furthermore, if this court concluded that there were no waiver and if appellees' allegations concerning DEQ's real intentions upon entering the Zortman Agreement were true, DEQ would be allowed to benefit from the bankruptcy confirmation without being held accountable for violating it. The Supreme Court recently addressed the inequity of this tactic: "[A]n interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages." *Lapides v. Bd. of Regents Univ. Sys. of Georgia*, 535 U.S. 613, 620, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002). Given this possibility, this court concludes that DEQ's waiver reaches the instant case so that the agency's entreaty for sovereign immunity must fail.

### III. *Conclusion*

Accordingly, **IT IS ORDERED** that the Bankruptcy Court's Order denying appellants' motion to dismiss (Bankr.File # 59) is **AFFIRMED.**