**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | ) BAP No. CC-10-1275-PaKiSa |
| | ) |
| WILSHIRE COURTYARD, | ) Bk. No. LA 97-10771 PC |
| | ) |
| Debtor. | ) |
| _____ | ) |
| | ) |
| CALIFORNIA FRANCHISE TAX BOARD, | ) |
| | ) |
| Appellant, | ) |
| v. | ) **O P I N I O N** |
| | ) |
| WILSHIRE COURTYARD; JEROME H. | ) |
| SNYDER GROUP I, LTD.; LEWIS P. | ) |
| GEYSER REVOCABLE TRUST; GEYSER | ) |
| CHILDREN'S TRUST, FBO Jennifer | ) |
| Geyser, Lewis P. Geyser, Trustee; | ) |
| WENDY K. SNYDER; JEROME H. SNYDER; | ) |
| GEYSER CHILDREN'S TRUST, FBO | ) |
| Daniel Geyser, Lewis P. Geyser, | ) |
| Trustee; RUSSELL & RUTH KUBOVEC, | ) |
| DECEASED, KUBOVEC FAMILY TRUST, | ) |
| Rita Farmer, Trustee; WILLIAM N. | ) |
| SNYDER; JOAN SNYDER; GEYSER | ) |
| CHILDREN'S TRUST, FBO Douglas | ) |
| Geiser, Lewis P. Geyser, Trustee; | ) |
| LON J. SNYDER; SNYDER CHILDREN'S | ) |
| TRUST, FBO William N. Snyder, | ) |
| Lewis P. Geyser, Trustee, | ) |
| | ) |
| Appellees. | ) |
| _____ | ) |

Argued and submitted on May 13, 2011
at Pasadena, California

Filed - September 19, 2011

Appeal from the United States Bankruptcy Court
for the Central District of California

Hon. Samuel Bufford, Bankruptcy Judge and Hon. Vincent Zurzolo,
Chief Bankruptcy Judge, Presiding.[1]

---

[1] As explained below, Bankruptcy Judges Bufford and Zurzolo each entered orders that are implicated in these appeals.

Appearances:     Todd M. Bailey appeared for Appellant California Franchise Tax Board.

Lewis P. Geyser appeared for Appellees Jerome H. Snyder Group I, Ltd., Lewis P. Geyser Revocable Trust, Wendy K. Snyder, Jerome H. Snyder, Geyser Children's Trust, FBO Jennifer Geyser, Lewis P. Geyser, Trustee, Geyser Children's Trust, FBO Daniel Geyser, Lewis P. Geyser, Trustee, Russell & Ruth Kubovec, Deceased, Kubovec Family Trust, Rita Farmer, Trustee, William N. Snyder, Joan Snyder, Geyser Children's Trust, FBO Douglas Geyser, Lewis P. Geyser, Trustee, Lon J. Snyder and Snyder Children's Trust, FBO William N. Snyder, Lewis P. Geyser, Trustee.

Lewis R. Landau appeared for Appellee Wilshire Courtyard.

_____

Before:  PAPPAS, KIRSCHER and SARGIS,[2] Bankruptcy Judges.

PAPPAS, Bankruptcy Judge:

In this complicated dispute, the Panel is asked to review the opinions and orders of the bankruptcy court entered in a reopened chapter 11[3] real estate partnership reorganization case, and in particular, the state tax consequences of confirmation of the debtor's plan for its former partners.  While the substantive issues raised in this appeal involve interesting, complex questions about the interplay of bankruptcy and tax law, we may not comment on those issues.  Instead, the Panel is compelled to

---

[2]  The Honorable Ronald H. Sargis, Bankruptcy Judge for the Eastern District of California, sitting by designation.

[3]  Because this bankruptcy case was filed over a decade ago, unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

-2-

reverse the bankruptcy court's ruling that it had subject matter jurisdiction to adjudicate the issues in this contest, to vacate the orders of the bankruptcy court, and to remand this matter to the bankruptcy court with instructions that it dismiss.

## FACTS[4]

### Events Before the Reopening of the Bankruptcy Case.

Wilshire Courtyard ("Wilshire") was a California general partnership.[5] We refer to its general partners, the appellees in this appeal, collectively as the "Wilshire Partners."

Wilshire began operations in 1984. By 1987, Wilshire had developed and owned two commercial complexes on Wilshire Boulevard in Los Angeles containing almost a million square feet of rental office space (the "Property").

In 1989, Wilshire entered into several financing agreements concerning the Property. As a result of these transactions, the secured lender holding the first position lien on the Property was Continental Bank, N.A. ("Continental"); various other entities held subordinated secured debt. Wilshire's combined secured debt aggregated almost $350 million. Wilshire defaulted on the Continental loan in July 1996, and Continental scheduled a foreclosure sale for July 9, 1997. In response, Wilshire filed a chapter 11 bankruptcy petition on July 8, 1997.

Appellant California Franchise Tax Board ("CFTB") was listed in the creditor's matrix filed by Wilshire. CFTB acknowledges

---

[4] The material facts in this appeal are undisputed.

[5] Through the chapter 11 process, Wilshire was transformed from a general partnership to a limited liability company; in this opinion, "Wilshire" refers to both the original partnership as well as the reorganized debtor/limited liability company.

-3-

that it received the initial notice of the commencement of the case sent out by the clerk of the bankruptcy court. However, for the reasons discussed below, CFTB did not file a proof of claim, assert any other claim, nor otherwise participate in Wilshire's bankruptcy case.

Early in the bankruptcy case, Continental was acquired by Bank of America ("BA").[6] BA, Wilshire, and the Wilshire Partners eventually negotiated a joint, consensual plan of reorganization. Under the terms of the joint plan, when it became effective, Wilshire would be restructured from a California general partnership to a Delaware limited liability company. It would continue to own and operate the Property. Wilshire would arrange for a new, nonrecourse loan for $100 million, secured by a first deed of trust on the Property.

For its part in the reorganization, BA agreed to contribute $23 million to the reorganized Wilshire, and to release its secured indebtedness, in exchange for its receipt of the $100 million in new loan proceeds. In consideration of its agreements, BA would receive a 99 percent ownership interest in the reorganized Wilshire; the Wilshire Partners would receive the remaining one percent interest. For giving up almost all of their former equity in the business, the Wilshire Partners would also receive $3.5 million in cash, and a $450,000 loan.

Wilshire's disclosure statement was approved by the

[6] According to the plan of reorganization eventually approved by the bankruptcy court, BA was acting as a trustee and servicer for several secured creditors. For convenience, and because it is not essential in this appeal, we will refer to all of these secured creditors collectively as "BA."

-4-

bankruptcy court on February 19, 1998. The disclosure statement did not address the state tax consequences for the Wilshire Partners as a result of the transactions proposed in the reorganization plan.

Notice of the confirmation hearing concerning the joint plan was sent by Wilshire to interested parties in the bankruptcy case on February 12, 1998. However, CFTB was not served with a copy of the proposed plan nor given notice of the confirmation hearing.[7]

After the confirmation hearing, the bankruptcy court entered an Order Confirming the Joint Plan of Reorganization on April 14, 1998. CFTB acknowledges that it received the "Notice of Order Confirming [Wilshire's] Chapter 11 Plan" from the clerk of the bankruptcy court, which stated in relevant part that, "Notice is hereby given of the entry of an order of this Court confirming a Plan of Reorganization. A copy of the order and the plan itself are contained in the Court file located at the address listed herein."

A plan having been confirmed, the Wilshire case was closed by the bankruptcy court in an order entered on October 22, 1998. Wilshire contends, and CFTB has not effectively disputed, that the confirmed plan was implemented and consummated, in that the restructure of the reorganized Wilshire, and the various transfers and transactions contemplated by the confirmed plan, were all

---

[7] While Wilshire and the Wilshire Partners argue that CFTB received effective notice or had knowledge of the bankruptcy proceedings by other means, Wilshire apparently did not serve notice of the plan and confirmation hearing on CFTB because it had not filed proofs of claim in the bankruptcy case. Of course, for its part, CFTB did not consider itself to be a "creditor" in the bankruptcy case, since the general partnership Wilshire was not a taxable entity.

-5-

completed.

After the plan was confirmed, the various Wilshire Partners reported approximately $208 million in aggregate cancellation of debt income ("CODI") on their individual 1998 California state tax returns. Then, on November 15, 2002, CFTB sent Wilshire and the Wilshire Partners an "Audit Issue Presentation Sheet" ("AIPS"). The AIPS informed them that CFTB challenged the Wilshire Partners' characterization of the tax consequences of the transactions effected by the confirmed chapter 11 plan as CODI. Rather than $208 million in CODI, CFTB argued that the Wilshire Partners should have reported approximately $231 million in capital gain income arising from the plan transactions, because the treatment of their interests under the plan constituted a disguised sale of the Property. Based on the AIPS, CFTB issued notices of proposed assessments to the Wilshire Partners on June 15, 2004, totaling approximately $13 million in unpaid income taxes.

The Wilshire Partners disputed CFTB's position. Over the next five years, CFTB and The Wilshire Partners engaged in several rounds of administrative hearings relating to this dispute.[8]

## Reopening of the Bankruptcy Case.

On May 27, 2009, the contest shifted back to the bankruptcy court. Wilshire filed an ex parte motion to reopen the bankruptcy case. As cause for reopening, Wilshire argued that, through the AIPS and the continuing administrative hearings, CFTB was

---

[8] CFTB states in its brief that, upon reopening of the bankruptcy case, and receipt of the Order to Show Cause discussed below, the CFTB hearing officer suspended work on the administrative hearings. There is no other information in the record concerning the status of those administrative hearings.

-6-

attempting to collaterally attack the confirmed chapter 11 plan by characterizing its terms as effecting a disguised sale of the Property while, according to the plan, Wilshire had retained ownership of the Property. The bankruptcy court granted the motion and entered an order reopening the bankruptcy case on June 4, 2009.

Wilshire then filed a motion for an Order to Show Cause Re Contempt ("OSC") on June 23, 2009. The bankruptcy court entered the OSC on August 12, 2009, directing CFTB to appear before the bankruptcy court to show why it should not be held in contempt for collaterally attacking, and by refusing to act in accordance with, the plan and confirmation order.

CFTB responded to the OSC on August 27, 2009, arguing that Wilshire had not given CFTB adequate notice of the terms of the proposed plan, the time for objecting to the plan, or of the confirmation hearing, so CFTB was not bound by the plan and confirmation order; Wilshire lacked standing to prosecute the OSC motion; issuance of a contempt order by the bankruptcy court against CFTB would be fundamentally unfair, because the state tax consequences of the plan terms were never considered, and would have been beyond the authority of the bankruptcy court to determine; and Wilshire was guilty of laches because it had delayed raising these issues in the bankruptcy case for six years.

Wilshire replied on September 9, 2009, arguing that CFTB received adequate notice of the filing of the bankruptcy case and proceedings and entry of the confirmation order; Wilshire had both prudential and constitutional standing to seek enforcement of the confirmation order. CFTB could not prove its affirmative defense

-7-

of laches.

The bankruptcy court held an initial hearing on the OSC on September 15, 2009. Wilshire and CFTB appeared by counsel; the Wilshire Partners, however, were not represented. After hearing arguments of counsel, the bankruptcy court directed the parties to submit further briefing whether a contempt motion was proper under the circumstances of this case, and suggested that the individual Wilshire Partners should be joined as parties to the proceedings.

After a continued status conference, on March 12, 2010, acting under authority of Rule 7019, made applicable in contested matters by Rule 9014(c), the bankruptcy court ordered the joinder of the Wilshire Partners in the proceedings. None of the Wilshire Partners objected to the joinder order.

Wilshire and the Wilshire Partners filed a joint Motion for Summary Judgment or Summary Adjudication of Issues on May 3, 2010. In the motion, they repeated Wilshire's earlier allegations concerning CFTB's receipt of adequate notice in the chapter 11 case, that CFTB's characterization of the plan transactions as a disguised sale amounted to a collateral attack on the plan, and that the confirmation order should be enforced under applicable provisions of the Bankruptcy Code.

CFTB filed an opposition to the summary judgment motion on June 9, 2010, generally countering these allegations. In addition to its earlier arguments, CFTB also argued that the bankruptcy court lacked subject matter jurisdiction to decide the motion, and that even if it had jurisdiction, the bankruptcy court should abstain from considering the tax issues. If the bankruptcy court was inclined to resolve the tax issues, and to decide whether the

plan transactions did indeed result in CODI rather than capital gain, CFTB requested a six-month continuance to undertake discovery on that issue.

Wilshire and the Wilshire Partners responded to CFTB's opposition on June 16, 2010, generally repeating and supporting their earlier arguments.

The bankruptcy court conducted a hearing on both the OSC and summary judgment motion on June 22, 2010, at which all the parties were represented by counsel. The bankruptcy court rejected CFTB's request to submit additional briefing, and denied its request for additional time for discovery. After hearing from the parties, the bankruptcy court addressed the issues, and in particular, focused on one particular finding it had made in the Confirmation Order, providing that:

> V. The Joint Plan and all agreements, settlements, transactions and transfer contemplated thereby do not provide for, and when consummated will not constitute, the liquidation of all or substantially all of the property of the Debtor's Estate under Bankruptcy Code section 1141(d)(3)(A)[.]

Order Confirming the Debtor's Joint Plan of Reorganization Dated December 12, 1997 at ¶ V (entered April 14, 1998) ("Finding V"). Interpreting the meaning of this provision of the order, the bankruptcy judge stated: "I'm determining that the finding in the confirmation order is that the transaction provided for in the plan was not a sale for any purpose. . . . [B]ecause it's not a sale there's no tax imposed on the partnership. There's no gain to be taxed [to] the partnership." Hr'g Tr. 40:7-15 (June 22, 2010). However, the bankruptcy court was uncertain as to the tax consequences to the Wilshire Partners, and requested further

-9-

briefing from the parties.

Both parties filed supplemental briefs. On July 15, 2010, the bankruptcy court entered an Order for Summary Adjudication, memorializing its oral ruling at the June 22 hearing that, according to Finding V, "the transaction under the plan is not a sale or exchange for any purpose."

The bankruptcy court held a second hearing on the summary judgment motion on July 20, 2010. Early in the hearing, the court noted that its July 15, 2010 order interpreting Finding V was effective only as to Wilshire, and only tentative as to the individual Wilshire Partners. After hearing the arguments of the parties, the bankruptcy court announced it would grant summary judgment to Wilshire and the Wilshire Partners. Among the rulings made by the bankruptcy court were that: (a) § 1141 provides that all creditors are bound by the plan, and this includes the CFTB; (b) the terms of the confirmed plan also apply to the Wilshire Partners; (c) and the CFTB's actions constitute contempt of the confirmation order, and CFTB would be ordered to cease and desist. Hr'g Tr. 30:1-3; 8-9; 18-19 (July 20, 2010).

On July 26, 2010, CFTB filed a timely appeal of the bankruptcy court's July 15, 2010 order, its July 20 oral rulings, together with "any judgment, order or decree related to the July 20, 2010 decision."

On August 31, 2010, the bankruptcy court entered a published "Opinion on Summary Judgment Motion" (the "Opinion"). In re Wilshire Courtyard, 437 B.R. 380 (Bankr. C.D. Cal. 2010). In it, the court defended its subject matter jurisdiction on three grounds. First, it held, the bankruptcy court had continuing,

-10-

post-confirmation jurisdiction over matters with a "close nexus" to the bankruptcy case. Second, it opined that CFTB's alleged violation of the confirmation order required interpretation of that order, and the court had jurisdiction to interpret and enforce its own orders. And third, the bankruptcy court decided that, since this case required it to make income tax determinations regarding the non-debtor partners, which in turn required the court to make a determination of the nature of the income at the partnership/debtor level, these determinations also involved interpretation and enforcement of its confirmation order. In re Wilshire Courtyard, 437 B.R. at 384.

Moving to the merits of the contest, the essential holding of the Opinion can be summarized in an excerpt:

> The court holds that the interests of the [Wilshire Partners] are wholly derivative from the status of the property in the partnership. In consequence, [C]FTB cannot recharacterize the plan transactions at the partner level without recharacterizing them at the partnership level as well. Because [C]FTB has not brought any such recharacterization application before this court (and cannot because the statute of limitations has run), [C]FTB is prohibited by the plan from claiming that the partners can be taxed on the plan transactions as a sale generating taxable income.

Id. at 383.

On October 4, 2010, the bankruptcy court entered a final "Order Granting Summary Judgment." With some minor discrepancies, this final order was consistent with the Opinion.[9]

_____

[9] Up to this point, the proceedings in the bankruptcy court were conducted, and the decisions and orders entered, by presiding Bankruptcy Judge Bufford. Because of his retirement, this final order was entered by then-Chief Bankruptcy Judge Zurzolo without further hearings. While it is not critical to our analysis, we presume Judge Zurzolo also entered the order without conducting an independent review and analysis of the issues of law previously

(continued...)

-11-

On September 13, 2010, CFTB filed an amended notice of appeal, now seeking review of the July 15 order, the July 20 oral decision, the August 31 Opinion, and the October 4, 2010 Order Granting Summary Judgment.

## JURISDICTION

CFTB challenges the bankruptcy court's decision that it had subject matter jurisdiction to resolve the issues in this case. This contention is addressed in detail below. There is no challenge to the Panel's jurisdiction over this appeal, however, which is clear under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court had subject matter jurisdiction to adjudicate the issues in this appeal.

## STANDARD OF REVIEW

The existence of subject matter jurisdiction is a question of law reviewed de novo. Atwood v. Fort Peck Tribal Court Assiniboine, 513 F.3d 943, 946 (9th Cir. 2008); Carpenter v. FDIC (In re Carpenter), 205 B.R. 600, 604 (9th Cir. BAP 1997). De novo review is independent, with no deference given to the trial court's conclusions. See First Ave. W. Bldg., LLC v. James (In re Onecast Media, Inc.), 439 F.3d 558, 561 (9th Cir. 2006).

## DISCUSSION

### The bankruptcy court lacked subject matter jurisdiction to adjudicate the Wilshire Partners' state tax obligations.

CFTB asserts numerous arguments challenging the merits of the

---

[9](...continued) decided by Judge Bufford. And because we determine, infra, that the bankruptcy court lacked subject matter jurisdiction to enter its various orders, we need not examine any of the possible inconsistencies between the Opinion and the final order.

-12-

bankruptcy court's rulings that CFTB may not pursue recovery from the Wilshire Partners for capital gains taxes allegedly due under state law. Wilshire and the Wilshire Partners dispute CFTB on each substantive point, urging the Panel to affirm the decisions of the bankruptcy court. However, before we may review the parties' arguments concerning the substance of this dispute, the Panel must conclude that the bankruptcy court had subject matter jurisdiction to make its decisions. Because we decide that the bankruptcy court lacked jurisdiction to adjudicate the individual Wilshire Partners' state tax obligations, the Panel will not address the other issues or arguments of the parties in this appeal.

The decisions of the Ninth Circuit guide us to our conclusion.[10] In determining the scope of a bankruptcy court's jurisdiction, we begin with the statutory scheme, because the "jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." Battle Ground Plaza, LLC v. Ray (In re Ray), 624 F.3d 1124, 1130 (9th Cir. 2010) (quoting Celotex Corp. v. Edwards, 514 U.S. 300, 307 (1995)). A bankruptcy court's jurisdiction is, generally, prescribed by 28 U.S.C. § 1334(b). In addition to granting jurisdiction to bankruptcy courts over bankruptcy cases, the statute provides that

---

[10] The Panel is cognizant of the Supreme Court's recent decision in Stern v. Marshall, 131 S. Ct. 2594 (2011), wherein the court holds that a bankruptcy court lacks "constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." Id. at 2620. However, we conclude that the Supreme Court's decision is inapposite to the issues raised in this case involving a post-confirmation challenge to the bankruptcy court's jurisdiction to decide the tax dispute between the Wilshire Partners and CFTB.

-13-

"the district courts [and by reference pursuant to 28 U.S.C. § 157, the bankruptcy courts] shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

Because in many respects the bankruptcy courts' statutory jurisdiction is narrow in focus, we individually examine each potential basis for the bankruptcy court's assertion of subject matter jurisdiction, below.

**1. "Arising under" and "arising in" jurisdiction.**

Only when a right to relief is created by title 11 does an action to enforce that right "arise under title 11." Harris v. Wittman (In re Harris), 590 F.3d 730, 737 (9th Cir. 2009); see H.R. Rep. No. 595, 95th Cong., 1st Sess. 445 (1977). Similarly, proceedings "arising in" bankruptcy cases, for purposes of the jurisdictional statute, are also usually easy to identify as those that, although not based on any right granted in title 11, would not exist outside a bankruptcy case, such as matters related to the administration of the bankruptcy estate. Maitland v. Mitchell (In re Harris Pine Mills), 44 F.3d 1431, 1435-37 (9th Cir. 1995). Neither of these statutory bases for jurisdiction can be invoked in this case.

In our view, adjudication of the dispute between the Wilshire Partners and CFTB does not implicate either the bankruptcy court's arising under or arising in jurisdiction. No provision of the bankruptcy code dealing with state tax consequences is at issue, nor were other chapter 11 provisions used by Wilshire in an attempt to restructure the tax consequences of plan confirmation. Instead, reduced to its essence, the contest in the bankruptcy

-14-

court in this case concerned whether, because of the terms of the order confirming Wilshire's reorganization plan,[11] the Wilshire Partners owe the State of California $13 million in taxes on what CFTB characterizes as their income from capital gains. The parties acknowledge that this dispute did not arise until long after confirmation of the Wilshire plan, when CFTB issued the AIPS in 2002, and then in 2004 assessed the Wilshire Partners for this tax liability. While originally casting their motion as one for a finding that CFTB was guilty of "contempt," the real relief sought from the bankruptcy court in the motion filed by Wilshire, and later joined by the Wilshire Partners, was a declaration from the bankruptcy court that, as a result of confirmation of the plan, the individual Wilshire Partners received cancellation of debt income, not capital gains, and an order prohibiting CFTB from collecting the taxes and vacating the assessments. Viewed in this fashion, this contest is at bottom a tax dispute between the Wilshire Partners and CFTB arising under California state tax law,

[11] In making its decision, the bankruptcy court relied not on any express provision of Wilshire's plan characterizing the transactions as something other than a sale of Wilshire's assets, but instead, on a "finding" made in its order confirming the plan. We do not say here that, in a case where a chapter 11 debtor clearly invokes the substantive provisions of title 11 to restructure debtor-creditor relations, to modify rights of third parties, or to transfer bankruptcy estate property, the bankruptcy court lacks jurisdiction to interpret and enforce those plan provisions on those who are bound by its terms, and to prevent a collateral attack or serial litigation concerning the confirmation order. But this is not such a case, as it is undisputed that the disclosure statement and chapter 11 plan filed by Wilshire, served on its creditors, and eventually confirmed by the bankruptcy court simply makes no mention of the "sale/no-sale" attributes of the property transfers, or of the state tax consequences to the Wilshire Partners of confirmation of that plan. Such an "after the fact" declaration by the bankruptcy court giving CFTB no inkling of what was intended is not an adequate basis for the bankruptcy court's decision to assume jurisdiction.

-15-

not the bankruptcy code. In other words, the Wilshire Partners' right to relief, if any, does not "arise under" any provision of the bankruptcy code.

It is equally clear that this dispute does not "arise in" a case under the bankruptcy code. Under the case law, this language in the jurisdictional statute refers to an "administrative matter unique to the bankruptcy process that has no independent existence outside of bankruptcy and could not be brought in another forum, but whose cause of action is not expressly rooted in the bankruptcy code." In re Ray, 624 F.3d at 1131. Wilshire and the Wilshire Partners do not argue that the critical issues raised by the contempt motion in these proceedings could not have been prosecuted in state court. Indeed, the parties were actively litigating the Wilshire Partners' alleged tax liability in the state administrative proceedings that were on-going at the time Wilshire sought to reopen the bankruptcy case. The Wilshire Partners certainly could have sought relief from CFTB's tax assessment in those proceedings, and if necessary, in state court.

The Wilshire Partners disagree, and instead suggest that this contest could not "feasibly be adjudicated in any alternate forum due to the procedures applicable to the adjudication of tax disputes." Wilshire Partner's Reply Br. at 7 (emphasis added). They explain that, under California law, a taxpayer has no recourse to the state courts until after a disputed tax is paid, at which point the taxpayer may sue for a refund. Nast v. St. Bd. of Equalization, 46 Cal. App. 4th 343, 346-47 (Cal. Ct. App. 1996). According to the Wilshire Partners, they lack an "accessible alternate venue" for the adjudication of the tax

-16-

dispute, because it could not "feasibly be adjudicated" in the state court, apparently because of the extent of the taxes CFTB seeks to collect from them.

The Wilshire Partners' argument that the state proceedings were not "feasible" lacks merit in the context of determining the subject matter jurisdiction of the bankruptcy court. First, by reopening the bankruptcy case, the pending state administrative proceedings in which the parties' positions on the assessments and issues were being considered were interrupted. Presumably, absent the bankruptcy proceedings initiated by Wilshire, the state administrative proceedings would have progressed toward determining the Wilshire Partners' tax liabilities.

Second, there is nothing in the bankruptcy code or case law that provides that the "arising in" jurisdiction of a bankruptcy court requires that the proceedings available in the alternative forum be prompt or feasible. The requirement for bankruptcy court jurisdiction is that an action have "no independent existence outside of bankruptcy and could not be brought in another forum." In re Ray, 624 F.3d at 1131 (emphasis added). Moreover, the suggestion by Wilshire and the Wilshire Partners that the delay caused by the state tax procedures renders those proceedings unfair is at odds with the Supreme Court's conclusion in another case that the CFTB's procedures for settling tax disputes constitute "a plain, speedy and efficient remedy." Cal. Franchise Tax Bd. v. Alcan Aluminium Ltd., 493 U.S. 331, 338 (1990).

Simply put, the issues raised by Wilshire and the Wilshire Partners in this case did not "arise under" the bankruptcy code, nor "arise in" a bankruptcy case.

-17-

## 2.   "Related to" jurisdiction.

In response to CFTB's challenge, the bankruptcy court addressed the question of its subject matter jurisdiction in its Opinion.  Although the court did not employ the precise terms, we construe its holding to be that it had "related to" jurisdiction under 28 U.S.C. § 1334(b), ancillary jurisdiction to interpret the plan and confirmation order, and supplemental jurisdiction over the claims of the nondebtor Wilshire Partners.  Under the applicable case law, we respectfully disagree that jurisdiction existed under any of those grounds.

Whether the bankruptcy court had related to jurisdiction is a harder question than arising in or arising under, because this jurisdictional component covers a much broader set of disputes, actions and issues.  Indeed, related to jurisdiction arguably includes almost every matter or action that directly or indirectly relates to a bankruptcy case.  Sasson v. Sokoloff (In re Sasson), 424 F.3d 864, 868-69 (9th Cir. 2005).  Here, Wilshire and the Wilshire Partners contend that not only are terms of the Wilshire confirmed plan called into question by CFTB's position, but its actions constitute, in substance, a collateral attack on the bankruptcy court's confirmation order.  At first blush, these arguments would seem to be "related to" Wilshire's bankruptcy case.

The bankruptcy court explained its view of its related to jurisdiction in this case as follows:

> [T]hough a bankruptcy court has more limited subject matter jurisdiction post-confirmation than pre-confirmation, it retains post-confirmation subject matter jurisdiction over matters with a "close nexus" to the bankruptcy case [citing In re Pegasus Gold Corp.,

-18-

394 F.3d at 1193-94]. Matters involving "the interpretation, implementation, consummation, execution or administration of the confirmed plan will typically have the requisite close nexus." Id. at 1194. In this case, the determination whether [C]FTB's actions violate the confirmation order involves an interpretation of the confirmed plan, and confers continuing subject matter jurisdiction on the court after plan confirmation.

In re Wilshire Courtyard, 437 B.R. at 384. The bankruptcy court's reasoning that the parties' request that it "interpret" the plan and confirmation order establishes the "close nexus" to the bankruptcy case so as to confer related to subject matter jurisdiction is, in our view, flawed. More precisely, as the case law discussed below shows, in order to find the requisite close bankruptcy nexus and establish post-confirmation jurisdiction in a chapter 11 case, the outcome of the issues before the bankruptcy court must potentially impact the debtor, the estate, or the implementation of the plan of reorganization. Here, the outcome of the Wilshire Partners' tax dispute with CFTB will have no impact whatsoever on the debtor, the estate, or the implementation of the Wilshire plan of reorganization.

As the bankruptcy court acknowledged, in recent years various courts of appeal have articulated the limits on bankruptcy court related to jurisdiction over matters arising after confirmation of a debtor's reorganization plan. See, e.g., Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 166-67 (3d Cir. 2004) ("the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter"); Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.), 266 F.3d 388, 390-91 (5th Cir. 2001) (post-confirmation

-19-

bankruptcy jurisdiction limited to matters pertaining to implementation or execution of the plan).

The Ninth Circuit has adopted the "close nexus" test of Resorts Int'l for measuring post-confirmation related to bankruptcy court jurisdiction. State of Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d 1189, 1194 (9th Cir. 2005) (reasoning that while this test "recognizes the limited nature of post-confirmation jurisdiction, [it] retains a certain flexibility"). In Resorts Int'l, the Third Circuit considered what it perceived to be problems in its existing precedent, Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984).[12] In Pacor, the court had held that "the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." Id. at 994. The Pacor test, however, proved less than useful in determining related to jurisdiction after confirmation of a plan because the bankruptcy estate no longer exists. In Resorts Int'l, the court shifted the emphasis to whether "there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." 372 F.3d at 166-67. Although the Third Circuit

---

[12] Pacor is among the most influential decisions in bankruptcy law, and forms the analytical framework for related to jurisdiction in the Third, Fourth, Fifth, Eighth, Ninth and Eleventh Circuits. See, e.g., Fietz v. Great W. Sav. (In re Fietz), 852 F.2d 455, 457 (9th Cir. 1988) ("We . . . adopt the Pacor definition [of related to jurisdiction]. . . . We reject any limitation on this definition[.]"). Although Pacor is somewhat dated, it is still the "grandfather" of related to analysis, and its caution that related to jurisdiction requires an effect on the bankruptcy estate [or, as its progeny interpreted Pacor for postconfirmation purposes, the debtor or the plan] is instructive for our purposes.

-20-

never precisely defined what it meant by "close nexus," it cited numerous case examples of a nexus that would support jurisdiction. In re Resorts Int'l, Inc., 372 F.3d at 167, citing Donaldson v. Bernstein, 104 F.3d 547, 552 (3d Cir. 1997) (post-confirmation proceeding concerning the reorganized debtor's failure to pay unsecured creditors according to terms in the plan); U.S. Tr. v. Gryphon at the Stone Mansion, 216 B.R. 764 (W.D. Pa. 1997), aff'd 166 F.3d 552 (3d Cir. 1999) (dispute regarding post-confirmation U.S. Trustee quarterly fees); Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.), 86 F.3d 364, 372-73 (4th Cir. 1996) (dispute over calculation of attorney fees that could affect treatment of remaining claims under the plan). However, the import of the Resorts Int'l analysis is even more revealing by its citation of example cases where the facts did not establish a sufficiently close nexus to support bankruptcy jurisdiction. In re Resorts Int'l, Inc., 372 F.3d at 168 (giving example of dispute between a plan liquidating trust and tobacco manufacturers that would have "no impact on any integral aspect of the bankruptcy plan or proceeding," citing Falise v. Am. Tobacco Co., 241 B.R. 48, 52 (E.D.N.Y. 1999)); Grimes v. Graue (In re Haws), 158 B.R. 965, 971 (Bankr. S.D. Tex. 1993) (in an action by trustee against partner of the debtor, trustee failed to prove how any damages received from the defendant were "necessary to effectuate the terms of [the plan]"). In short, under Resorts Int'l, as a condition for bankruptcy court post-confirmation jurisdiction, the outcome of a dispute must produce some effect on the reorganized debtor or a confirmed plan. Indeed, immediately following its review of this

-21-

case law, the Third Circuit concluded "where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate." Id. at 168-69. This statement is quoted by the bankruptcy court in this case to justify that interpretation of a plan provision, standing alone, provides a basis for subject matter jurisdiction over this dispute.[13] But fairly read, it is clear that the Resorts Int'l court did not intend that a need for plan interpretation support post-confirmation jurisdiction in all cases, but only in those where the results of plan interpretation would have a demonstrable impact on the debtor or confirmed plan of reorganization.

As noted, the Ninth Circuit adopted the close nexus test in In re Pegasus Gold, a seminal decision exploring the limits of post-confirmation bankruptcy jurisdiction. Pegasus Gold involved a dispute between the debtor and the State of Montana over financial responsibility for reclamation and water treatment costs. The parties had reached a settlement agreement approved by the bankruptcy court under which the debtor agreed to establish a new entity, RSC, which would perform the reclamation work. The debtor funded RSC, and a share of RSC became an asset of the debtor's liquidating trust established in the debtor's chapter 11 plan.

After confirmation of the plan, disagreements arose between

---

[13] The bankruptcy court cited to Pegasus Gold for this statement. Pegasus Gold in turn cited to Resorts Int'l.

-22-

the State and trust almost immediately, and the State terminated RSC. The Liquidating Trustee then filed a complaint for breach of contract against the State in the bankruptcy court. Although the State objected, the bankruptcy court held it had jurisdiction, and the State appealed.

When the appeal eventually reached the Ninth Circuit, it affirmed the bankruptcy court's decision in favor of its jurisdiction. In re Pegasus Gold, 394 F.3d 1189. Applying the Resorts Int'l close nexus test, the court noted that although the trustee's complaint alleged numerous state law contract and tort claims against the State, at least three of those claims, and the remedies sought by the trustee, could conceivably affect the implementation and execution of the confirmed reorganization plan, especially the funding of RSC, and the cash flow into the liquidation trust from RSC income. Id. at 1194. As a result, the court held that the bankruptcy court had related to jurisdiction over those claims. Id.

Because the bankruptcy court had subject matter jurisdiction over some of the trustee's claims, the Ninth Circuit held that the bankruptcy court could also properly adjudicate the remaining trustee claims against the State by exercising supplemental jurisdiction under 28 U.S.C. § 1367, because those additional claims arose from a "'common nucleus of operative facts' and would ordinarily be expected to be resolved in one judicial proceeding." Id. at 1195, citing United Mine Workers v. Gibbs, 383 U.S. 725, 725 (1966) and Sec. Farms v. Int'l Bhd. Of Teamsters, 124 F.3d 999, 1008 (9th Cir. 1997).

The Ninth Circuit further explained the meaning of the close

-23-

nexus test it first articulated in Pegasus Gold in Sea Hawk Seafoods, Inc. v. State of Alaska (In re Valdez Fisheries Dev. Ass'n, Inc.), 439 F.3d 545 (9th Cir. 2006). In Valdez Fisheries, a creditor of a former chapter 11 debtor commenced an adversary proceeding in the bankruptcy court in connection with a closed bankruptcy case to determine the effect of its settlement agreement with the debtor on its fraudulent conveyance claim against another creditor. On appeal, the court held that, on the facts of that case, the claims asserted in the adversary proceeding failed the close nexus test, and therefore, the bankruptcy court lacked subject matter jurisdiction to entertain the creditor's suit. The court noted there was no confirmed plan, and there was no assertion that the outcome of the dispute between two creditors, Sea Hawk and the State of Alaska, would have any effect on the estate in the closed bankruptcy case. In the court's view, to show a close nexus, the outcome of a dispute must "alter the debtor's rights, liabilities, options, or freedom of action or in any way impact upon the handling and administration of the bankrupt estate." Id. at 548 (quoting In re Fietz, 852 F.2d at 427). In Valdez Fisheries, the court distinguished its holding from that in Pegasus Gold, observing that the post-confirmation claims asserted by debtor that the State of Montana had breached the terms of a confirmed reorganization plan and "the outcome of those claims could affect the implementation and execution of the plan." Id. at 548.

The Ninth Circuit most recently visited related to jurisdiction after confirmation in a chapter 11 case in In re Ray, 624 F.3d 1124. In Ray, the bankruptcy court had approved the sale

-24-

of a parcel of property owned by the debtor and his nondebtor co-owner, free and clear of the first refusal rights previously granted by them to Battle Ground Plaza, LLC ("BG Plaza"). After the debtor's plan was confirmed and the bankruptcy case was closed, BG Plaza sued the reorganized debtor, the nondebtor co-owner, the purchaser, and the purchaser's successor in state court for breach of its contractual right of first refusal. Because the sale was originally authorized under a bankruptcy court order, the state court, in its words, "remanded" the action to the bankruptcy court, and stayed proceedings in state court pending the bankruptcy court's determination whether it retained jurisdiction over the transaction and dispute. In re Ray, 624 F.3d at 1129. The bankruptcy court assumed jurisdiction and proceeded to construe the sale order and resolve the parties' claims.

When the dispute finally reached the Ninth Circuit, the court decided that the bankruptcy court lacked jurisdiction to decide a dispute between two nondebtors over the meaning of the bankruptcy court's sale order entered in a since-closed chapter 11 bankruptcy case. Applying Valdez Fisheries, the court concluded that, because the claims were all based upon Washington law, could exist entirely apart from the bankruptcy proceeding, and could not impact the closed bankruptcy case, the state court, not the bankruptcy court, should construe the sale order and adjudicate the parties' rights. Id. at 1134-35.

We distill several lessons from these decisions for application of the close nexus test as developed in Resorts Int'l, and as adopted and refined by the Ninth Circuit. Stated briefly, to support jurisdiction, there must be a close nexus connecting a

-25-

proposed post-confirmation proceeding in the bankruptcy court with some demonstrable effect on the debtor or the plan of reorganization.

Applying the Ninth Circuit case law to the facts of this appeal, while it is true Wilshire and the Wilshire Parties were asking the bankruptcy court to interpret its own confirmation order, it seems clear that the bankruptcy court lacked related to jurisdiction to adjudicate the tax issues between the Wilshire Partners and CFTB. All of the acts and transactions required to consummate and implement the confirmed plan in this case had been completed, and the bankruptcy case had long since been closed, by the time the tax dispute between the Wilshire Partners and CFTB arose. More importantly, the outcome of that tax dispute can have no conceivable effect on the implementation of the confirmed plan of reorganization, or on the reorganized debtor, Wilshire. Instead, any consequences from CFTB's actions will impact only the Wilshire Partners.

Moreover, as in Ray, the central issues in the Wilshire Partners-CFTB dispute concern application of California's tax laws, not bankruptcy law, to the transactions effected by the confirmed plan. As was the case in Ray, even if the terms of Wilshire's confirmed plan and the confirmation order are implicated in the resolution of this contest, the California administrative agencies and courts can construe their meaning.

Under Ninth Circuit case law, a close nexus between this tax dispute and the Wilshire bankruptcy case is missing. As a result, the bankruptcy court erred in assuming related to jurisdiction over this dispute.

-26-

**3.    Supplemental or ancillary jurisdiction.**

By this conclusion, we also dispose of the Wilshire Partners' argument that the bankruptcy court could properly exercise supplemental jurisdiction under 28 U.S.C. § 1367(a)[14] because "the common nucleus of operative facts was the interpretation of the Plan, Confirmation Order and section 346 [of the bankruptcy code] to determine whether the [C]FTB's issuances of Notices of Income Tax Due collaterally attack the Confirmed Plan and violate section 346(a) and (j)(1)."  Reply Br. at 10, citing In re Pegasus.

To support the exercise of supplemental jurisdiction, the statute requires that there be another claim as to which the bankruptcy court has original jurisdiction.  Sasson v. Sokoloff (In re Sasson), 424 F.3d 864, 869 (9th Cir. 2005) (holding that the bankruptcy court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) "over all other claims that are so related to claims in the action within [the bankruptcy court's] original jurisdiction that they form part of the same case or controversy").  However, as we explained above, the bankruptcy court lacked jurisdiction over any of the claims under these

_____

[14]   28 U.S.C. § 1367 provides:

Supplemental jurisdiction.

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

facts. Because of this, it also lacked supplemental jurisdiction over any other claims.

The bankruptcy court also concluded it possessed ancillary jurisdiction to interpret and enforce its orders:

> Further, a bankruptcy court retains subject matter jurisdiction to interpret and enforce its own orders. See Haw. Airlines, Inc. v. Mesa Air Group, Inc., 355 B.R. 214, 218 (D. Haw. 2006)("The law is clear that '[a] bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization'" (citing Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 230 (2d Cir. 2002))). Accordingly, this court retains subject matter jurisdiction to interpret and enforce the chapter 11 plan and the confirmation order.

In re Wilshire Courtyard, 437 B.R. at 384. We also disagree with the bankruptcy court on this point.

"Ancillary jurisdiction may rest on one of two bases: (1) to permit disposition by a single court of factually interdependent claims, and (2) to enable a court to vindicate its authority and effectuate its decrees." In re Valdez Fisheries, 439 F.3d at 549, citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 379-80 (1994); In re Ray, 624 F.3d at 1135. The bankruptcy court here relied on the second prong of ancillary jurisdiction — to vindicate its authority and effectuate its decrees.

Significantly, the two cases cited by the bankruptcy court to support its ancillary jurisdiction deal with interpretation and enforcement of court orders that have an effect on the reorganized debtor and the administration of a bankruptcy estate. In Hawaiian Airlines, the debtor commenced a post-confirmation adversary proceeding against an investor for return of property of the bankruptcy estate. The adversary proceeding asked the bankruptcy

-28-

court to interpret and enforce its Plan Procedures Order, which governed the relationships between the reorganized debtor and potential investors. Specifically, the orders to be interpreted related to contracts between the trustee and parties directly affecting the administration and assets of the estate itself. Haw. Airlines, 355 B.R. at 217. Likewise, in Petrie Retail, the bankruptcy court was called upon to interpret and enforce orders enjoining a creditor from commencing or continuing an action contingent upon the interpretation of lease provisions that were at issue in the administration of the debtors' estate. In re Petrie Retail, 304 F.3d at 225.

In short, the two cases relied on by the bankruptcy court to support ancillary jurisdiction both involve actions, the outcome of which would directly affect the debtor and the operation or implementation of its plan of reorganization. In the present appeal, on the other hand, the results of the tax dispute between the Wilshire Partners and CFTB will have no effect on either the debtor (i.e., Wilshire), any estate, or the confirmed plan of reorganization.

The Ninth Circuit's most recent review of ancillary jurisdiction is also found in In re Ray, 624 F.3d at 1135-36. The Ray bankruptcy court had held that it had jurisdiction and this Panel affirmed under both related to and ancillary jurisdiction. Id. at 1129. As to the bankruptcy court's purported need to vindicate and effectuate its sale order, the court of appeals observed that ancillary jurisdiction should only be used "when necessary to resolve bankruptcy issues, not to adjudicate state law claims that can be adjudicated in state court." Id. at 1136.

Applying In re Ray to the present appeal, the claims in dispute here are tax claims asserted solely by CFTB against the Wilshire Partners, and thus most comparable to the state contract claim rejected as a basis for ancillary jurisdiction in In re Ray.

The Wilshire Partners attempt to counter these holdings by citing the Supreme Court's recent holding in Travelers Indem. Co. v. Bailey, 129 S. Ct. 2195 (2009) ("Travelers"). Travelers involved an appeal of the bankruptcy court's "Clarifying Order" entered in 2004 that interpreted the scope of an injunction contained in a prior order confirming a chapter 11 plan entered in 1986. Because of its distinctly different facts, we do not believe Travelers controls here.

Travelers was the principal insurance company for Johns-Manville ("Manville"), a supplier of raw asbestos. When studies began to mount showing a link between asbestos exposure and respiratory diseases, the prospect of overwhelming liability led Manville to file for bankruptcy protection under chapter 11. Travelers, 129 S. Ct. at 2199. The parties and the bankruptcy court ultimately concluded that the solution to Manville's predicament was "a plan of reorganization for [Manville] which would provide for payment to holders of present or known asbestos health related claims . . . and [to] those persons who had not yet manifested an injury but who would manifest symptoms of asbestos-related illnesses at some future time." In re Johns-Manville Corp., 97 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).

The bankruptcy court confirmed a plan of reorganization that created the Manville Personal Injury Settlement Trust (the "Trust"). Manville's insurers agreed to provide most of the

-30-

initial corpus of the Trust, with $80 million contributed by Travelers. Travelers, 129 S. Ct. at 2199. However, the insurance companies refused to contribute the funds without the protection of an injunction from the bankruptcy court limiting their exposure to direct claims (i.e., claims not through the Trust). On December 18, 1986, the bankruptcy court entered an Insurance Settlement Order, providing that upon the insurers' payment of the settlement funds to the Trust, "all Persons are permanently restrained and enjoined from commencing and/or continuing any suit, arbitration or other proceeding of any type or nature for Policy Claims against any or all members of the Settling Insurer Group [including Travelers]." Travelers, 129 S. Ct. at 2199 (quoting the December 18, 1986, bankruptcy court's Settlement Order). The Settlement Order was incorporated by reference in the bankruptcy court's December 22, 1986, order confirming Manville's chapter 11 plan. Id. The settlement order and plan confirmation order were affirmed by the district court, and then by the Second Circuit. Id. at 2200.

Over a decade later, claimants began filing direct actions against Travelers, not based upon Manville's wrongdoing, but alleging that its insurers had violated state consumer protection statutes or their common law duties. Travelers asked the bankruptcy court to enjoin several of those direct actions. The bankruptcy court entered its Clarifying Order, which provided that the 1986 settlement order and reorganization plan barred the direct actions. 129 S. Ct. at 2201. On appeal of the Clarifying Order, the district court affirmed, but the Second Circuit reversed, holding that the bankruptcy court had exceeded its

-31-

jurisdiction in entering the original 1986 settlement order and injunction barring direct action against insurers, including Travelers. The Supreme Court granted certiorari.

The Supreme Court's <u>Travelers</u> decision principally concerns whether the bankruptcy court correctly interpreted its 1986 orders. However, there were two jurisdictional issues resolved by the Court.

First, the Court ruled that the Second Circuit had erred in concluding that the bankruptcy court did not have jurisdiction to enter the Settlement Order in 1986. Second, the Court ruled, agreeing with the Second Circuit, that the "Bankruptcy Court plainly had [subject-matter] jurisdiction to interpret and enforce its own prior orders." 129 S. Ct. at 2205. As authority for this proposition, the Court cited <u>Local Loan Co. v. Hunt</u>, 292 U.S. 234 (1934), where the following statement appears:

> The pleading by which respondent invoked the jurisdiction of the bankruptcy court in the present case is in substance and effect a supplemental and ancillary bill in equity, in aid of and to effectuate the adjudication and order made by the same court. That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled.

<u>Id.</u> at 239.

Viewing the <u>Travelers</u> decision in context, we observe the following: (1) The underlying order that the bankruptcy court interpreted and enforced was an injunction that was negotiated by the parties to the original settlement agreement, and incorporated in the plan of reorganization, and the record clearly indicates that the essential parties (the debtor and the insurance

-32-

companies) would not have agreed to plan confirmation without the settlement agreement and injunction; (2) the Court's ruling that a bankruptcy court "plainly" had subject matter jurisdiction to interpret and enforce its own prior orders should be viewed in this context, that the Clarifying Order related to an injunction that had been negotiated and considered an essential part of the plan of reorganization. The citation the Court provided as authority for its general proposition reinforces the principle that exercise of ancillary subject matter jurisdiction must in some way relate to an order that "preserves the fruits and advantages" of the previous order.

The Travelers decision was made in the context of a complex history, where the order being interpreted related to an injunction that was a sine qua non for the acceptance of the plan of reorganization. After ruling that the bankruptcy court had jurisdiction to approve the original settlement agreement and enter the injunction, the Supreme Court considered the ancillary subject matter question and ruled in light of its previous decision in Hunt that the bankruptcy court had jurisdiction. The presence of the Hunt citation shows that the Court had in mind that, based on the facts of Travelers, ancillary subject matter jurisdiction in that context related back to preserving a benefit (a fruit or advantage) granted in the original order. In short, we believe Travelers is not directly relevant to the current appeal, because the bankruptcy court's orders interpreting the plan did not act to preserve a benefit negotiated in the plan of reorganization or, indeed, have any effect on the plan of reorganization.

The Wilshire Partners attempt to distinguish In re Ray by noting that Ray dealt solely with a request that the bankruptcy court enforce, not interpret, its earlier orders: "This act of interpreting, not merely enforcing, an earlier order distinguishes [Travelers and this case] from Ray because the Ray case merely involves the act of enforcing the effect of the earlier sale order. While enforcement can occur in any court, only the Bankruptcy Court could interpret its own order." The Wilshire Partners' Opening Br. at 7.

Of course, the Wilshire Partners' argument is incorrect on its face. It is a gross overstatement to say that the bankruptcy court is the only court that could interpret its orders. Courts daily interpret the decisions and orders made by other courts – indeed, one basic task of any court is the interpretation of case law, a process of understanding and applying the orders and rulings of "other" courts.

We also disagree with the Wilshire Partners' analysis of the Ninth Circuit's holding in In re Ray. In that case, the state court was called upon to interpret the meaning of the bankruptcy court's sale order in order to determine if a breach of contract occurred. Though asked to do so by the state court, the Ninth Circuit held that the bankruptcy court should not have interceded in the breach contest, and that it lacked jurisdiction to interpret the sale order where the plan had been implemented and the bankruptcy case had long-since been closed. In re Ray, 624 F.3d at 1136. As we read the Ninth Circuit's decision, both interpretation and enforcement of the sale order were matters properly submitted to the state court, not the bankruptcy court.

-34-

In sum, we conclude that the bankruptcy court in this case lacked related to jurisdiction, or ancillary or supplemental jurisdiction, to adjudicate the tax dispute between the Wilshire Partners and CFTB.

## CONCLUSION

As the Ninth Circuit observed in <u>In re Ray</u>, "[r]eopening of the bankruptcy case is rare, and only used when necessary to resolve bankruptcy issues, not to adjudicate state law claims that can be adjudicated in state court." 624 F.3d at 1136. Because the bankruptcy court lacked subject matter jurisdiction to enter the various orders in this contest, we VACATE those orders and REMAND with instructions that the bankruptcy court dismiss this matter.